**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**MATOUK INDUSTRIES, INC., Respondent.**

**No. 77–1556.**

United States Court of Appeals, First Circuit.

Argued June 8, 1978.

Decided Aug. 21, 1978.

---

8.  This of course would be true of any appeal from orders refusing to quash subpoenas.

126

Richard A. Cohen, Washington, D. C., with whom John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, and Howard E. Perlstein, Atty., Washington, D. C., were on brief, for petitioner.

Vicente J. Antonetti, San Jaun, P. R., with whom Goldman, Antonetti & Davila, San Juan, P. R., was on brief, for respondent.

Before COFFIN, Chief Judge, BOWNES, Circuit Judge, and PETTINE,* District Judge.

COFFIN, Chief Judge.

This case, before us on the Board's petition for enforcement of its order, requires us to decide whether the record supports the Board's conclusion that Local 601 of the International Ladies' Garment Workers' Union had attained an untainted card majority and whether the bargaining order issued was proper.

The Union called a meeting of former employees of a defunct unionized business in order to distribute severance benefits. Seven of those present were employed by respondent when the meeting was held on February 26, 1975. At that time respondent was not unionized, but was a target of a unionization campaign. After distributing the checks a Union business agent explained the delay in getting the checks and told those present that their benefits as Union members would cease except that they would continue to be covered by the Union's medical plan for six months. This last statement was untrue, and in fact those present then employed by respondent were no longer covered by the Union plan.

According to testimony accepted by both the administrative law judge (the ALJ) and the Board, after the business agent's speech, those present "became very happy, they were very happy for having received the benefits and then one of them asked [the business agent] what could be done so that they would receive some benefits from the Matouk factory because the owners of Matouk factory were bad people and that

they did not give them any benefits and that they needed to improve their living conditions and their working conditions." The business agent referred the question to a union organizer who:

"told the workers who were there that they had knowledge of the organizational campaign that was being carried on in the industrial zone, that they also knew that we had been for some time in front of the factory and that in order for them to receive some benefits or to improve their living and working conditions that although they had been members of the union it was very important for them to sign the authorization cards. . . .

"As to the benefits of the union [he] explained to them that they, as members of the union, already had knowledge of the benefits that they had enjoyed while they had been members."

All seven of respondent's employees who were present signed authorization cards before leaving the meeting. Ten more of respondent's 24 or 25 workers[1] signed cards in June and July of 1975.

In April of 1975 respondent's general manager, Julio Ortiz, gave a special raise to several employees. He asked two of them, who had been at the February 26 meeting, whether they were working to get the Union into the factory. They both said no, and he told them he did not want a union in the plant. On July 14, the Union delivered a letter to Ortiz demanding recognition as the exclusive bargaining representative of respondent's employees based on an asserted authorization card majority. The ALJ found the following:

"About half an hour later, an angry Ortiz, letter in hand, called all the employees together and told them about the Union's claim. He said he was very annoyed because he thought he had friends among the employees since he had been like a friend, a fellow worker, to them. He said that their signing authorization cards was a betrayal of him. He said he

wanted to know how many of them had done so. He then pointed to each employee in turn and asked whether that person had signed a card. Those who had admitted it. Ortiz then said that, since the matter was a serious one and the home office was on vacation, he would have to close the plant in order to go to New York and talk to Mr. Matouk, the owner." (footnote omitted)

On July 16 the Union sent Ortiz a second letter protesting his behavior on July 14 and again demanding recognition. The next day, not having closed the plant or gone to New York, Ortiz called another meeting. He apologized for his July 14 conduct and then, again quoting the ALJ:

"He said that, instead of going to New York, he had gone to the Company's attorney, who had advised him that he could not fire or suspend them for what they had done. He told them to think carefully about what they were doing because they did not need the Union. He compared their benefits to those at other plants in the area. He talked about the possibility that unionization might ultimately lead to closing of the plant. In this connection he referred to a plant that had burned down and others that had closed. He told the employees not to let Local 601's representatives into their homes because the representatives would only brainwash them. He said that they would have to work harder in future and could expect less from him because his attitude toward them was different. He told them they could, if they wanted, sign a paper in front of an attorney which would repudiate the cards they had signed. (Some employees subsequently did so. The papers were notarized by an attorney to whom Respondent stipulated it was indebted for performance of this service.) He said he knew which employees were urging the others to sign cards. When [one] asked him to name the leaders among them, he accurately listed [them]."

[1.] There is some dispute as to whether one of the seven employees at the February 26 meeting is properly included in the bargaining unit or is a supervisor. The outcome of that controversy has no bearing on this case.

Still later, August 19, Ortiz, thinking he had seen an employee working for the Union, told that employee "you are working for the Union and that's not good for you. I saw you last night."

The ALJ found that activities at the February 26 meeting had tainted the Union's card majority. Therefore, he did not find an unlawful refusal to bargain, § 8(a)(5) of the National Labor Relations Act, 29 U.S.C. § 158(a)(5), or issue a bargaining order, but he found that respondent had violated § 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1), "[b]y interrogating employees about their union activities; by threatening employees with plant closure, more onerous working conditions, and the withholding of future benefits if they engaged in union activities; ·by creating the impression it had employees' union activities under surveillance; and by soliciting employees go [sic] give up their right to have a union represent them and assisting them in their efforts to that end." The ALJ issued an order aimed at correcting these § 8(a)(1) violations. The Board reversed the ALJ's finding that the majority was tainted, issued a bargaining order, and affirmed the ALJ's decision with respect to the § 8(a)(1) violations and corrective order.[2]

■ The Board's findings of fact are conclusive if we find substantial evidence on the record as a whole to support them. 29 U.S.C. § 160(e); *NLRB v. South Shore Hospital,* 571 F.2d 677, 682 (1st Cir. 1978). The situation is complicated where, as here, the Board disagrees with the ALJ as to conclusions to be drawn from facts. We have explained the deference accorded the Board's findings, in part, by pointing to the ALJ's opportunity to hear and see the witnesses as well as the Board's special expertise in the field of labor relations. *Id.; Trustees of Boston University v. NLRB,* 548 F.2d 391, 393 (1st Cir. 1977). But it is the Board to which the statute commits the ultimate responsibility of resolving labor disputes, 29 U.S.C. § 160(c), and this respon-

sibility "is wholly inconsistent with the notion that [the Board] has power to reverse an examiner's findings only when they are 'clearly erroneous'." *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 492, 71 S.Ct. 456, 467, 95 L.Ed. 456 (1951). *See Sign and Pictorial Union v. NLRB,* 136 U.S.App.D.C. 144, 152, 419 F.2d 726, 734 (1969).

■ The ALJ's findings are part of the whole record and must be given such weight "as in reason and in the light of judicial experience they deserve . . . [E]vidence supporting a conclusion may be less substantial when an impartial, experienced examiner who has observed the witnesses and lived with the case had drawn conclusions different from the Board's . . . ." *Universal Camera Corp., supra,* 340 U.S. at 496, 71 S.Ct. at 469. It follows that we should give more careful scrutiny to Board orders where the Board has exercised its authority to draw different inferences from those drawn by the ALJ. *Jervis Corp., Bolivar Division v. NLRB,* 387 F.2d 107, 113 (6th Cir. 1967). On the other hand, the significance of the disagreement is diminished when it is confined to drawing different inferences or legal conclusions as opposed to questions of fact or credibility. *Laborer's District Council of Georgia and South Carolina v. NLRB,* 163 U.S.App.D.C. 308, 313 n. 16, 501 F.2d 868, 873 n. 16 (1974); *NLRB v. Lenkurt Electric Co.,* 438 F.2d 1102, 1105 n. 3 (9th Cir. 1971); *Hawkins v. NLRB,* 358 F.2d 281, 284 (7th Cir. 1966). In such cases the Board's special understanding is at least as important an aid in interpreting the facts as is the ALJ's immersion in the case.

Here the essential point of disagreement is the importance of the role that the business agent's erroneous statement about union health benefits played in prompting respondent's employees to ask how they could get the Union into their factory. The ALJ concluded:

"The link between [the] misrepresentation and [the] solicitation of the cards is

---

2. Respondent has complied with the ALJ's order aimed at correcting the § 8(a)(1) violations. Respondent made and the Board granted a mo-

tion to amend the Board's final order by eliminating that portion of the order pertaining to § 8(a)(1) violations.

obvious. [The business agent] painted Local 601 as the source of benefits, making the employees very happy. They immediately wanted to know how they could get more because the owners of Respondent were bad people who did not give them anything. [The organizer] immediately said by signing cards to be represented at Respondent by Local 601. All seven immediately signed. There is nothing in the record to give a different picture . . . . [The] testimony can only lead to the conclusion that the misrepresentation was the decisive factor in causing the employees to sign cards on February 26."

This is a possible interpretation of the facts, and had the Board agreed, we could find it based on substantial evidence. But the Board did not agree:

"We find, in all the circumstances, the signing of the authorization cards by these seven employees is not attributable to the negligent statement of [the business agent] . . . . [A]fter the checks were distributed, [the agent] was asked what could be done so that the employees would receive *some* benefit to improve their living and working conditions. The question was referred to [the organizer] who told the group that 'in order for them to receive *some* . . . benefits or to improve their living and working conditions,' they should sign the authorization cards. There is no evidence that [he] based his solicitation of the employees upon the benefits of the medical plan or referred in any way to such benefits. Rather than discussing in detail the benefits of the Union, which might have been necessary had the workers at the meeting been unfamiliar with the Union, [he] merely 'explained to them that they,

as members of the union, already had knowledge of the benefits that they had enjoyed while they had been members.' The cards were then distributed and signed. Accordingly, it seems clear to us that the seven workers, all of whom had been union members before and were familiar with the benefits of the Union, were induced to sign the authorization cards because they desired to obtain 'some benefits' from Respondent and sought to improve 'their living conditions and their working conditions.' Accordingly, we find that the Union, at the time it sought recognition, represented an uncoerced majority of the employees in the unit sought." *Matouk Industries, Inc.,* 230 N.L.R.B. ——, —— (1977) (emphasis supplied in original)

■ In this statement of reasons the Board explains the source of its disagreement with the ALJ.[3] The Board's analysis of the context minimizes the impact of the off-hand mention of health benefits.[4] Instead the Board concludes that the workers were interested in a broader range of benefits. It bolsters this conclusion by pointing to the fact that neither the organizer at the meeting, nor the campaign later made an issue of health benefits. The Board relies on the same facts as the ALJ. The Board's interpretation of those facts is also a reasonable one. Therefore, we will not set it aside. *See Editorial "El Imparcial", Inc. v. NLRB,* 278 F.2d 184, 187 (1st Cir. 1960). Even considering the ALJ's contrary conclusion, the Board's finding of an untainted card majority is supported by substantial evidence in the record.

■ We must next decide whether, given that the Union did have an untainted card

---

3. When the Board rejects the ALJ's findings of facts, some statement of reasons supporting that action is desirable. *See Sign and Pictorial Union v. NLRB,* 136 U.S.App.D.C. 144, 152, 419 F.2d 726, 734 (1969); *Oil, Chemical and Atomic Workers Int'l Union v. NLRB,* 124 U.S.App. D.C. 113, 116, 362 F.2d 943, 946 (1966).

4. The disagreement turns on the employees' motivation in signing the authorization cards. "Since direct evidence of motive is 'seldom attainable,' the Board may infer intent from the circumstances surrounding discharges." *NLRB v. South Shore Hospital,* 571 F.2d 677, 682 (1st Cir. 1978). We see no reason why the same rule should not apply in contexts other than allegedly unlawful discharges.

majority, the Board's bargaining order was proper.[5] There is no question that the Board does have the power to go beyond entering a cease and desist order and to issue a bargaining order "as a remedy for a § 8(a)(5) refusal to bargain where an employer has committed independent unfair labor practices which have made the holding of a fair election unlikely or which have in fact undermined a union's majority . . . ." *NLRB v. Gissel Packing Co.,* 395 U.S. 575, 610, 89 S.Ct. 1918, 1938, 23 L.Ed.2d 547 (1969). Here the Board summarized the respondent's violations of the Act and concluded:

> "Based on the foregoing, we find that Respondent has created an atmosphere which has effectively destroyed any possibility of an opportunity for the exercise of a free choice by employees. Such a substantial, pervasive, and extensive unlawful course of conduct, which included a threat of plant closure, requires a finding, under *Gissel,* that a bargaining order is the only effective remedy." (footnote omitted)

These findings are responsive to the factors mentioned by the Court in *Gissel,* 395 U.S. at 613–614, 89 S.Ct. 1918, and, assuming the findings are accurate, they are sufficient to support issuance of the order.

■ On these facts, the characterization of respondent's unlawful conduct as "substantial, pervasive, and extensive" is supported by substantial evidence. Further, the Board could properly conclude that once having threatened plant closure, and having solicited and provided legal assistance for repudiation of individual's representation cards, respondent had destroyed the possibility of a fair election. The actual conduct of respondent's general manager could well overshadow any subsequent statements by

respondent that its employees should feel free to vote according to their choice in an election. Accordingly we will order enforcement of the Board's order.

■ We share with other circuits, however, concern that the Board, in issuing bargaining orders, which are extreme remedies, is doing so without adequately explaining its reasons or performing the kind of analysis necessary to permit a court of appeals to perform its statutory review obligations. *See, e.g., NLRB v. Armcor Industries, Inc.,* 535 F.2d 239, 244 (3d Cir. 1976); *Peerless of America, Inc. v. NLRB,* 484 F.2d 1108, 1118–19 & n. 16 (7th Cir. 1973). We recognize that not enough is known to guarantee that predictions of employee behavior will always be accurate. *See NLRB v. Kaiser Agriculture Chemicals,* 473 F.2d 374, 383 & n. 10 (5th Cir. 1973). We also recognize that "[i]t is for the Board and not the courts [to determine whether traditional remedies are sufficient], based on its expert estimate as to the effects on the election process of unfair labor practices of varying intensity. In fashioning its remedies . . . the Board draws on a fund of knowledge and expertise all its own, and its choice of remedy must therefore be given special respect by reviewing courts. '[I]t is usually better to minimize the opportunity for reviewing courts to substitute their discretion for that of the agency.'" *NLRB v. Gissel, supra,* 395 U.S. at 612 n. 32, 89 S.Ct. at 1939 n. 32 (citations omitted); *see Trustees of Boston University v. NLRB, supra,* 548 F.2d at 394. Notwithstanding our keen awareness of such ordinary constraints, where the Board fails to support its conclusions with reasoning that we can evaluate, we may feel obliged to remand to the Board for further proceedings. *See NLRB v. Armcor Industries, Inc.,* (3d Cir.

---

5. The Board urges us to hold that respondent is barred from raising arguments before us against the propriety of the Board's bargaining order because it failed to raise such arguments before the Board. *See International Ladies' Garment Workers' Union v. Quality Mfg. Co.,* 420 U.S. 276, 281 n. 3, 95 S.Ct. 972, 43 L.Ed.2d

189 (1975). Respondent did, however, argue to the Board that the ALJ was correct in refusing to find a § 8(a)(5) violation. Such a position necessarily included rejection of a bargaining order. Respondent is certainly not trying to raise an issue that was not part of the case below.

No. 77–1494, May 1, 1978); *NLRB v. Armcor Industries, Inc., supra.*

The order of the Board is *enforced.*