**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**BORDEN, INC., BORDEN CHEMICAL DIVISION, Respondent.**

**No. 78–1320.**

United States Court of Appeals, First Circuit.

Argued Jan. 4, 1979.

Decided June 22, 1979.

---

Jay E. Shanklin, Washington, D. C., with whom John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moor, Deputy Associate Gen. Counsel, and Michael Murchison, Washington, D. C., were on brief, for petitioner.

William F. Joy, Boston, Mass., with whom Robert P. Joy, and Morgan, Brown, Kearns & Joy, Boston, Mass., were on brief, for respondent.

Before COFFIN, Chief Judge, CAMPBELL and BOWNES, Circuit Judges.

BOWNES, Circuit Judge.

The National Labor Relations Board (Board or NLRB) seeks enforcement of its order: that Borden, Inc. (Company) cease and desist from engaging in unfair labor practices; that it furnish Local No. 533, International Chemical Workers Union (Union) with the information requested; that it compensate former employee Donald J. Collette and any other eligible employees for unpaid accrued vacation benefits; and that it post the appropriate notices.[1]

The events in this dispute occurred at Borden's Leominster, Massachusetts, chemical manufacturing plant between August, 1976, and January, 1977, when the Union and the Company were negotiating a new contract. The Union had represented the production, maintenance, shipping, and trucking employees at the Leominster facility for some time and, in August of 1976, began the first of a long series of negotiating sessions with the Company in anticipation of the expiration of the existing contract on September 30, 1976. Donald J. Collette was at that time the president of the Union and the chief negotiator. In that capacity, he requested that the Company furnish the following information:

(1) the Company's average cost per hour per Leominster bargaining unit employee for its insurance programs (life, accident and sickness, and long-term disability) and pension plan;

(2) the average cost (contribution) per hour to the bargaining unit employees for the above programs;

(3) the combined contributions by employees and the Company for the Blue Cross-Blue Shield plan and the number of unit employees participating therein; and

(4) the amount and distribution of the dividends received by the Company on the insurance programs.

Borden's regional labor relations manager for the Northeast area, Allan Brenning, provided only the corporate wide hourly costs per employee for these benefits. The Company took the position that it could not calculate the specific costs attributable to the Leominster bargaining unit. The Company refused to furnish the combined contributions for the Blue Cross-Blue Shield plan, asserting that the Union could make this determination itself. To the request for the number of unit employees participating in the Blue Cross-Blue Shield program, the Company furnished a figure in excess of the number of employees in the entire unit. The Company did not furnish the amount of dividends received from the

---

1. The Board's decision and order is reported at 235 N.L.R.B. No. 138 (1978).

Metropolitan Life Insurance Company, nor did it explain how the dividends were distributed.

The Board agreed with the administrative law judge (ALJ) and found that the Company violated section 8(a)(5) and (1) of the Labor Relations Act, 29 U.S.C. § 158(a)(5) and (1), by refusing to furnish the Union with the amount of dividends which the Company received from the Metropolitan Life Insurance Company for the various plans covering Leominster bargaining unit employees. Reversing the ALJ, the Board found that the Company violated section 8(a)(5) and (1) of the Act by refusing to furnish the Union with its and the employees' average hourly cost per Leominster, Massachusetts, bargaining unit employee for the life insurance, accident and sickness insurance, long-term disability insurance and pension program. The Board, with one member dissenting, also differed with the ALJ and found that the Company violated section 8(a)(3) and (1) of the Act, 29 U.S.C. § 158(a)(3) and (1), by withholding employees' accrued vacation pay because of their strike activity.

The Company argues that the Board's order should not be enforced for two reasons: first, there is not substantial evidence in the record as a whole supporting the Board's finding that the Company violated section 8(a)(5) and (1) when it did not furnish the Leominster cost figures and the information pertaining to the insurance dividends; second, that the Board erred as a matter of law in concluding that the Company committed an unfair labor practice when it withheld employees' accrued vacation pay until after the contractual vacation period had expired.

■ At the outset, we note that ours is not a review de novo, but a review to determine whether the Board's findings are supported by substantial evidence in the record as a whole. 29 U.S.C. § 160(e); *Liberty Mutual Insurance Co. v. NLRB*, 592 F.2d 595 at 601 (1st Cir. February 13, 1979); *NLRB v. Middleboro Fire Apparatus, Inc.*, 590 F.2d 4, 6 (1st Cir. 1978).

### I. The Violations as to the Information Sought

The Board reversed the ALJ on the conclusions drawn from the facts. The ALJ concluded that the Company fulfilled its obligation to produce information concerning the insurance plans by supplying the corporate cost. He decided that the Company had no obligation to produce the average employee costs for the benefit plan since the Union could, in his view, calculate this information from Company pamphlets. Finally, the ALJ concluded that the Company satisfied its duty to provide the information regarding the number of unit employees in the Blue Cross-Blue Shield plan when it proffered a figure reflecting unit and nonunit beneficiaries. The Board reviewed the same evidence and determined that in none of these areas did the Company fulfill its statutory obligation to bargain in good faith.

As we explained in *NLRB v. Matouk Industries, Inc.*, 582 F.2d 125 (1st Cir. 1978): "In such cases the Board's special understanding is at least as important an aid in interpreting the facts as the ALJ's immersion in the case." *Id.* at 128. *See also NLRB v. Pilgrim Foods, Inc.*, 591 F.2d 110, 117–18 (1st Cir. 1978).

■ Since the Board's review was based on the same facts and its interpretation is a reasonable one, we will not set it aside. *Matouk, supra,* at 129. We are satisfied that the Board adequately dealt with the findings of the ALJ. *See Frattaroli v. NLRB*, 590 F.2d 15, 18 and 19 n. 7 (1st Cir. 1978), where the Board failed to justify its finding which was contrary to the ALJ's, and consequently we did not enforce its order.

Upon examining Borden's argument on this first issue, we note with some puzzlement the novel interpretation it gives to *NLRB v. Truitt Mfg. Co.*, 351 U.S. 149, 76 S.Ct. 753, 100 L.Ed. 1027 (1956). The Company takes one line from *Truitt* at 153, 76 S.Ct. at 756, that "[e]ach case must turn upon its particular facts," and attempts to use this as a springboard for leaping over

all contrary legal precedent. By emphasizing the purported uniqueness of this factual situation, the Company dismisses peremptorily any unfavorable holding without citing any cases to support its position. We feel it necessary to tread our way through the applicable law.

■ The employer has a general obligation to provide relevant information that is needed by the bargaining representative for the proper performance of its duties. *Detroit Edison Co. v. NLRB,* —— U.S. ——, 99 S.Ct. 1123, 59 L.Ed.2d 333 (1979); *NLRB v. Acme Industrial Co.,* 385 U.S. 432, 435–36, 87 S.Ct. 565, 17 L.Ed.2d 495 (1967); *Western Mass. Elec. Co. v. NLRB,* 589 F.2d 42, 46 (1st Cir. 1978).

[4] The Board found that the Company's refusal to break down the corporate wide costs and to provide information concerning the insurance premiums amounted to a refusal to bargain collectively. This finding was supported by substantial evidence in the record and is in accord with the applicable law. The Board noted that in a letter of July 22, 1974, from Borden's corporate labor counsel to the NLRB concerning a prior dispute, the Company was able to pinpoint the ratio between premiums paid and the cost of claim payments specifically for the Leominster plant.[2] The Board considered the testimony of the Company's witness, Brenning, who admitted that Borden analyzes the costs of benefit programs for a particular facility for some purposes. He also testified that he met with Borden's director of employee benefits, Dennis Kiris, on September 6, 1976, in response to the Union's request for the Leominster costs. Brenning met with the Union negotiators on September 8, 1976, and informed them that he could furnish only the corporate wide costs. Despite the Union's persistent requests in the ensuing months of negotia-

tion for the Leominster costs, Brenning did not attempt to obtain further information from Company headquarters as to reasons why the corporate costs could not be allocated nor did he explore alternatives.

■■ The blanket refusal of the Company's chief negotiator to do more than repeat to the Union the Company's statement that unit figures were not available does not evince a good faith bargaining effort. As noted in *San Diego Newspaper Guild v. NLRB,* 548 F.2d 863, 867 (9th Cir. 1977), where the requested information is intrinsic to the core of the employer-employee relationship, and the employer refuses to provide requested information, the employer has the burden to prove either lack of relevance or to provide adequate reasons why 'he cannot, in good faith, supply the information. Borden failed to shoulder this burden.

Relying on *General Electric Co.,* 150 N.L.R.B. 192 (1964), *vacated on other grounds,* 382 U.S. 366, 86 S.Ct. 528, 15 L.Ed.2d 420 (1966), *enforced* 418 F.2d 736 (2d Cir. 1969), *cert. denied,* 397 U.S. 965, 90 S.Ct. 995, 25 L.Ed.2d 257 (1970), the Board held that Borden did not meet its obligation to obtain the requested information, to investigate alternative methods for obtaining the information, or to explain or document the reasons for its unavailability. The Company disparages the Board's reasoning, stating in conclusory fashion that neither the letter of its counsel nor the testimony of its witness, Brenning, supports the Board's finding that the Company had cost information available for the Leominster plant. Additionally, the Company presses us to distinguish both *General Electric Co., supra,* 150 N.L.R.B. 192, and *NLRB v. John S. Swift Co.,* 277 F.2d 641 (7th Cir. 1960), also relied upon by the Board, on the basis that in both of these cases the charged companies refused to di-

2. The letter reads in pertinent part: "An example of the experience at Leominster was given. It showed that premiums paid for that particular location had been insufficient to cover the cost of claims payments in 1972." Were this the linchpin of the Board's finding, our resolve of this issue might be different. From the information provided, it appears that this nota-

tion refers to Borden's claims experience at the Leominster plant which may or may not reflect an ability to extract the insurance cost figures for the Leominster bargaining unit. However, since the Board's finding in this regard is supported by other evidence, which we consider substantial, we need not delve deeply into the weight which the letter should be given.

vulge any of the information requested, while, here, Borden did release the corporate wide cost figures.

■ Borden misinterprets the holdings of these two cases, as well as the reading given them by the Board. The Board does not posit, as the Company states in its brief, that the employer has an obligation to furnish information in the exact form requested. Rather, the Board correctly emphasizes that the Company has an obligation to bargain in good faith. That duty, under both *General Electric Co.* and *Swift,* imposes on the Company an obligation to make a reasonably diligent effort to obtain relevant information. The Company's attempt to slough off its responsibility to bargain in good faith by claiming that it did in the main provide the Union with some information fails. The law is that a Company does not meet its obligation of disclosure by providing only some of the relevant data. *International Telephone & Telegraph Corp. v. NLRB,* 382 F.2d 366, 371 (3d Cir. 1967), *cert. denied,* 389 U.S. 1039, 88 S.Ct. 777, 19 L.Ed.2d 829 (1968).

■ The Board rejected the Company's position that the cost figures sought could be determined by the Union from the information furnished by the Company to the employees. Based on *The Kroger Company,* 226 N.L.R.B. 512 (1976), it found that the availability of the information from other sources did not relieve Borden of its obligation to furnish the requested figures. The Board also noted that the alternative sources pointed to by Borden, the Company brochures and the employees' individual pay stubs, did not contain all the requisite data, since to arrive at the average cost per employee per hour, the Union needed the annual earnings of each employee. Concededly, the Union could have polled each and every one of the one hundred thirty odd bargaining unit members to calculate this figure, but recourse to the Company was simpler, more efficient, and seemingly not overly burdensome for the Company. "The union is under no obligation to utilize a burdensome procedure of obtaining desired information where the employer may have

such information available in a more convenient form." *Kroger, supra,* 226 N.L.R.B. at 513.

The Company would distinguish *Kroger* from this case on the basis that the "critical facts" there were that the Company failed to respond to the Union's request. Borden does not have a clear focus of the holding on *Kroger.* Here, as there, the "critical facts" are that the Company deprived the Union of information which was readily available to the employer and would have been more burdensome for the Union to acquire. While the Company's failure to timely respond to the Union's request for information was a factor considered by the Board in *Kroger,* the linchpin of the holding is that a company may not play dog-in-the-manger just to put the Union through the hoops.

We affirm the holdings of the Board as to the section 8(a)(5) and (1) violations.

## II. *The Vacation Pay Violation*

The facts are not in dispute. The collective bargaining agreement between the Company and the Union, with an expiration date of September 30, 1976, contained the following vacation provisions:

### ARTICLE XXIII

#### Vacations

#### Section 1

Annual vacations with pay will be granted to employees as follows:

(a) Each employee with one (1) year of continuous employment or more immediately preceding June 1 of the current year will be granted two (2) week's vacation with pay.

(b) Any employee having less than one (1) full year, but more than six (6) months of continuous employment immediately preceding June 1 of the current year will be granted one (1) week's vacation with pay.

(c) Each employee with eight (8) years or more of continuous employment by December 31 of the current year will be

granted three (3) weeks vacation with pay.

\* \* \* \* \* \*

### Section 3

*Except where the Company and union determine otherwise in individual cases, employees shall not be paid vacation pay in lieu of vacation.*

\* \* \* \* \* \*

### Section 6

(a) Except when the Company closes for the vacation period, the Company will permit employees to take vacations between *June 1 and December 15* when so to do will not create an abnormal financial burden upon the Company or render the operation of the plant unduly hazardous or difficult.

(b) When the Company closes for the vacation period, the vacation period will be between June 15 and Labor Day (emphasis added).

The parties stipulated that all vacations accrued as of June 1, 1976. Union President Collette[3] and employee Sam Bland had the requisite seniority to be entitled to a third week of vacation, and each informed the foreman that he intended to take his third week of vacation during the first week in October. Bland received his vacation pay along with his regular wages on the payday preceding his vacation, which was September 29. On October 1, 1976, with the expiration of the contract, the strike began and continued until January 30, 1977. Collette requested his vacation pay on October 7, 1976, but was informed by the personnel services manager that the Company would not pay vacation compensation to strikers.[4] Borden paid the accrued vacation benefits on December 26, 1976.

The issue is whether the Company committed an unfair labor practice by withholding employees' accrued vacation pay because of their strike activity until after the contractual vacation period had expired. Borden argues that it did not commit an unfair labor practice because, under the terms of the contract, "employees shall not be paid vacation pay in lieu of vacation" and the contractual vacation period did not expire until December 15, 1976. This argument carried the day with the ALJ who relied solely on *G. C. Murphy & Co.,* 207 N.L.R.B. 579 (1973). In *Murphy,* which contained a provision forbidding payment of vacation pay in lieu of vacation, the collective bargaining agreement also contained a provision preventing employees from taking "vacation time as a credit against time lost for any other reason." The Board in *Murphy* found that the latter provision explicitly conferred upon the employer the right to determine the purposes to which vacation time could be put and concluded that, absent evidence that the provision had been applied discriminatorily, the employer was free to use this provision to deny vacation pay to employees who were out on strike.

The Board, with one member dissenting, reversed the ALJ and held that *G. C. Murphy Co.* was not controlling.[5] But for the strike, the Board found the employees would have received their vacation benefits when due. It, therefore, reasoned that vacation pay was due and owing when the employees made their requests. The Board rejected the Company's assertion that it was acting pursuant to a contractual obligation or any other legitimate business interest in denying the payments. It found that there was no evidence to support this position. In summary, the Board stated: "Accordingly, we conclude that the denial of

---

3. Collette had tentatively scheduled his extra week of vacation for December, but informed Gibbons that, if the Company were to strike, he would take the first week in October for his vacation.

4. We have not been informed of the number of striking employees who were entitled to vacation pay. Collette did not receive his vacation pay because he was discharged in November.

The propriety of Collette's termination is not before us.

5. Chairman Fanning dissented in *Murphy* and indicated that he maintains this stance in n. 6. Member Jenkins in n. 6 distinguished the present case from *Murphy* on a narrow reading of the pertinent contractual language governing vacations in each.

accrued vacation benefits solely because employees were engaged in protected strike activity was inherently destructive of employee rights and, therefore, violative of Section 8(a)(3) and (1) of the Act."

■ Under section 8(a)(3) of the Act, it is an unfair labor practice for an employer "by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." In *NLRB v. Erie Resistor Corp.*, 373 U.S. 221, 233, 83 S.Ct. 1139, 10 L.Ed.2d 308 (1963), the Supreme Court held that discouraging membership in a labor organization under section 8(a)(3) includes discouraging participation in concerted activities, such as a legitimate strike. The Court elucidated the standard of proof necessary where a section 8(a)(3) violation has been charged in *NLRB v. Great Dane Trailers, Inc.*, 388 U.S. 26, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967). In *Great Dane,* the employer refused to pay vacation benefits to strikers, but paid them to nonstrikers. The Court held that this was discrimination in its simplest form. The standard of proof is:

> First, if it can reasonably be concluded that the employer's discriminatory conduct was "inherently destructive" of the important employee rights, no proof of an antiunion motivation is needed and the Board can find an unfair labor practice even if the employer introduces evidence that the conduct was motivated by business considerations. Second, if the adverse effect of the discriminatory conduct on employee rights is "comparatively slight," an antiunion motivation must be proved to sustain the charge *if* the employer has come forward with evidence of legitimate and substantial business justifications for the conduct. Thus, in either situation, once it has been proved that the employer engaged in discriminatory conduct which could have adversely affected employee rights to *some* extent, the burden is upon the employer to establish that he was motivated by legitimate objectives since proof of motivation is most accessible to him (emphasis in original).

*Id.* at 34, 87 S.Ct. at 1798. The ALJ and Borden distinguish *Great Dane* on the ground that, here, there was no evidence that the Company discriminated between striking and nonstriking employees. While it is true that the employer in *Great Dane* was overt in his antiunion conduct, this is not dispositive. *Great Dane,* and indeed the Act, speaks to discrimination on the basis of union activity. The fact that an employer stigmatizes striking employees while leaving nonstrikers untouched may be an indication of the employer's hostility toward the Union, but such disparity of treatment is not necessary to find a section 8(a)(3) and (1) violation. As the court stated in *NLRB v. Jemco, Inc.,* 465 F.2d 1148, 1152 (6th Cir. 1972), *cert. denied,* 409 U.S. 1109, 93 S.Ct. 911, 34 L.Ed.2d 690 (1973):

> Although we are not referred to, nor do we find, any cases involving Section 8(a)(3) discrimination where all employees alike were denied an employment benefit, we do not believe that unequal treatment of different classes of employees is a prerequisite to finding a Section 8(a)(3) violation where all employees engaged in a concerted activity. [footnote omitted] The interpretation of Section 8(a)(3) which the Company urges us to adopt would lead to the somewhat absurd result that an employer could never be found in violation of that Section so long as he was careful to treat all employees alike, no matter how destructive of employee rights his conduct may be. The Section 8(a)(3) discrimination in the present case lies in the employment benefit afforded to all employees prior to their engaging in a concerted activity and the benefit which was denied to all employees after they engaged in such an activity.

Similarly, in *Allied Industrial Workers v. NLRB,* 155 U.S.App.D.C. 112, 476 F.2d 868 (1973), the court rejected an argument akin to the one advanced here by the Company, "A practice applied uniformly to all employees may be discriminatory and violate the Act just as a discriminatory practice may be held to be perfectly innocuous." *Id.* 155 U.S.App.D.C. at 121, 476 F.2d at 877. *See*

*also Texaco, Inc.,* 179 N.L.R.B. 989, 993 (1969).

The Board concluded that Borden's refusal to pay the vacation benefits to strikers when requested resulted in inhibition of the employees' free exercise of their fundamental right to strike. This conduct was found by the Board to be inherently destructive of employee rights. The Board, therefore, relying on *Great Dane Trailers, Inc., supra,* 388 U.S. 26, 87 S.Ct. 1792, 18 L.Ed.2d 1027, concluded that it was not necessary to consider evidence on antiunion motivation, and found that Borden violated section 8(a)(3) and (1). We disagree.

■ According to the teaching of *Great Dane, supra,* 388 U.S. at 34, 87 S.Ct. 1792, where the employer's conduct is "inherently destructive" of employee rights, the Board can find an unfair labor practice, even in the face of an employer's evidence that it was motivated by business considerations and absent a showing of antiunion motivation. However, where the effect of the employer's discriminatory conduct is "comparatively slight," and where the employer offers legitimate and substantial business justifications for the conduct, then the Board must prove antiunion motivation. In *Great Dane,* the Court, quoting *NLRB v. Erie Resistor Corp., supra,* 373 U.S. at 228, 231, 83 S.Ct. 1139, stated that conduct is inherently destructive if it "carries with it 'unavoidable consequences which the employer not only foresaw but which he must have intended' and thus bears 'its own indicia of intent.'" *Id.,* 388 U.S. at 33, 87 S.Ct. at 1797. The Court did not reach a determination of whether the employer's discriminatory treatment of strikers was inherently destructive or comparatively slight because the employer offered *no* justification for its behavior. Where such a determination has been necessary, as for example in *Portland Williamette Co. v. NLRB,* 534 F.2d 1331 (9th Cir. 1976), the court looked to see whether the conduct had far reaching effects which could hinder future bargaining or whether the conduct discriminated solely upon the basis of participation in strikes or union activity. *Id.* at 1334.

We do not view Borden's delayed payment of vacation benefits as conduct which bears its own indicia of intent carrying with it unavoidable consequences which the employer must have intended. This was, after all, a delay in vacation payments, not a refusal to pay at all.

■ Borden did come forward with evidence of a business justification for its conduct, namely, the terms of the collective bargaining agreement and past practice. The Board found this reason invalid because its interpretation of the contract differed from that of Borden's. This, however, is not a question of contract interpretation. The Board had a duty to determine whether Borden was motivated by its reliance on the collective bargaining agreement or by antiunion animus when it withheld the accrued vacation benefits. We caution the Board that it is neither our function nor the Board's to second-guess business decisions. "The Act was not intended to guarantee that business decisions be *sound,* only that they not be the product of antiunion motivation" (emphasis in original). *Liberty Mutual Insurance Co. v. NLRB,* 592 F.2d 595, 603 (1st Cir. 1979), quoting from *Stone & Webster Engineering Corp. v. NLRB,* 536 F.2d 461, 467 (1st Cir. 1976). *See NLRB v. Eastern Smelting & Refining Corp.,* 598 F.2d 666 at 670, 673 (1st Cir. 1979).

■ We remand in order that the Board may assess whether Borden came forward with a legitimate and substantial business justification for its conduct and, if so, whether the purported justification was pretextual. If Borden can demonstrate a substantial non-pretextual reason to justify its conduct, then the Board has the burden of establishing that Borden would not have withheld vacation benefits but for improper motivation. *Eastern Smelting, supra,* at 671.

*Enforcement of the Board's order is granted insofar as it relates to the section 8(a)(5) violation. The portion of the order relative to the section 8(a)(3) and (1) violation is vacated and the case remanded for further proceedings consistent with this opinion.*