United States Court of Appeals
 For the First Circuit

Nos. 15-2146, 15-2258

 SOUTHCOAST HOSPITALS GROUP, INC.,

 Petitioner/Cross-Respondent,

 v.

 NATIONAL LABOR RELATIONS BOARD,

 Respondent/Cross-Petitioner.

 PETITIONS FOR REVIEW OF AN ORDER OF
 THE NATIONAL LABOR RELATIONS BOARD

 Before

 Thompson and Kayatta, Circuit Judges,
 and Barbadoro,* District Judge.

 Joseph D. Whelan, with whom Matthew H. Parker and Whelan,
Corrente, Flanders, Kinder & Siket LLP were on brief, for
Petitioner/Cross-Respondent.
 Barbara Sheehy, Counsel, with whom Robert J. Englehart,
Supervising Attorney, Matthew Bruenig, Attorney, Richard F.
Griffin, Jr., General Counsel, Jennifer Abruzzo, Deputy General
Counsel, John H. Ferguson, Associate General Counsel, and Linda
Dreeben, Deputy Associate General Counsel, were on brief, for
Respondent/Cross-Petitioner.

 January 20, 2017

 * Of the District of New Hampshire, sitting by designation.
 BARBADORO, District Judge. Southcoast Hospitals Group,

Inc. was created through a merger of three hospitals. One of the

hospitals has a union workforce, and the union's collective-

bargaining agreement grants its members a hiring preference when

filling union positions. In an effort to produce more even-handed

hiring practices across its three hospitals, Southcoast adopted a

policy that grants nonunion employees a similar hiring preference

for nonunion positions. The union challenged the nonunion hiring

policy, contending that it discriminates against union members in

violation of section 8(a)(3) and (1) of the National Labor

Relations Act ("NLRA"), 29 U.S.C. § 158(a)(3), (1). A divided

three-member panel of the National Labor Relations Board ("Board")

determined that the policy was invalid because it was not supported

by a legitimate and substantial business justification. We vacate

the Board's order and remand the case for further proceedings

consistent with this opinion.

 I. BACKGROUND

A. Southcoast's Hiring Policies

 Southcoast was created through a 1996 merger of St.

Luke's Hospital, Charlton Hospital, and Tobey Hospital. Only

employees at Tobey are represented by a union. The union, 1199

Service Employees International Union United Health Care Workers

 - 2 -
East ("1199 SEIU"), represents approximately 215 technical,

clerical, service, and maintenance employees out of a total of 550

employees at Tobey.1 St. Luke's has approximately 2,700 nonunion

employees, and Charlton has approximately 2,100 nonunion

employees.

 Union members have enjoyed a hiring preference when

applying for union jobs at Tobey since at least the time of the

merger. The union's 2011 collective–bargaining agreement, which

was in effect during the relevant time period, provides in section

8.2 that "[v]acancies in bargaining unit positions [i.e., union

positions] . . . shall be filled on the basis of available

qualified applicants. Among such qualified applicants, the most

senior qualified applicant shall be selected." Section 8.1 defines

seniority in terms of time spent in union positions. When these

provisions are read together, they bar Southcoast from considering

any nonunion applicant for a union position unless all union

applicants are unqualified for the position.

 1
 Union workers at Tobey belong to one of three bargaining
units: technical workers, licensed practical nurses, and
registered nurses. 1199 SEIU represents both technical workers
and licensed practical nurses. Each bargaining unit is protected
by a separate collective-bargaining agreement. References in this
opinion to the "union" refer to 1199 SEIU. When we refer to "union
members," we mean members of 1199 SEIU's technical workers'
bargaining unit.

 - 3 -
 Southcoast developed its current policy for filling

vacancies in nonunion positions in 1999. That policy — HR 4.06 —

divides applicants into two broad categories. "Internal

Applicants" include all nonunion, regular-status employees, all

temporary and per diem employees, and union members who belong to

a union that "provides reciprocal opportunity to employees who are

not members of the union for open positions at the unionized site."

All other applicants are treated as "External Applicants." Among

Internal Applicants, HR 4.06 provides that regular-status

employees "will be given first consideration for job postings

providing the regular status employee's qualifications

substantially equal the qualifications of external candidates."

Temporary and per diem applicants are considered after regular-

status employees but before External Applicants. The policy bars

Southcoast from recruiting or considering any External Applicant

for a nonunion position until all qualified Internal Applicants

have been interviewed. Because the union's collective-bargaining

agreement includes a hiring preference for union members, they are

treated as External Applicants under HR 4.06.

 Southcoast's actual practice when filling vacancies in

nonunion positions differs somewhat from the process specified in

HR 4.06. Job openings are posted and advertised for all applicants

 - 4 -
at the same time. Applications are screened and qualified

applicants are placed into one of three groups by the company's

human resources department. Nonunion, regular-status applicants

are considered in the first round. If no one is selected from the

first round, union applicants are considered together with

temporary and per diem applicants in the second round. All other

applicants are considered in the third round if no one is selected

from the first two rounds.

 David DeJesus, a human resources official at Southcoast,

was responsible for creating HR 4.06. DeJesus claims that he had

received complaints from unnamed employees about union hiring

preferences both while working at Southcoast and in a prior job at

another company where union members enjoyed a similar preference.

He asserts that the company adopted HR 4.06 as a "matter of

equity." From his perspective, if the union excludes nonunion

employees from the first round of consideration for union positions

at Tobey, then "it should work the same way in the other

direction."

B. Enforcement of HR 4.06

 Christopher Souza, a union worker employed at Tobey,

applied for a building superintendent position at St. Luke's in

May 2011. The following month, human resources coordinator Lucilia

 - 5 -
Darosa notified Souza that Southcoast had chosen another

applicant. When Souza inquired as to why he had not been selected

for an interview, Darosa provided a citation to HR 4.06 and

explained that "[Southcoast] would not be able to consider you for

the first round interviews as you currently work at Tobey in a

[bargaining-unit] position." After reviewing HR 4.06, Souza made

a complaint to Lisa Lemieux, the union's organizer at Tobey from

2005 to 2012.

 Union members had been complaining to Lemieux about

their inability to obtain positions at St. Luke's and Charlton

since 2005, but Souza was the first to direct Lemieux's attention

to HR 4.06. Believing that HR 4.06 discriminated against union

workers, Lemieux contacted approximately 100 members of the union

to find any other individuals who had been denied employment at

St. Luke's or Charlton. Three employees eventually responded.

Two relayed information about their own experiences and the third

pointed Lemieux to Noelia Nunes, a union member who had

unsuccessfully tried to transfer to a nonunion position.

 From July 2011 through December 2011, Nunes submitted

six applications for positions at St. Luke's. For various reasons

— controverted below but not relevant here — her first five

applications produced no interview requests. Her sixth

 - 6 -
application resulted in an interview and a job offer in January

2012. Nunes accepted the position.

C. Administrative Proceedings

 The union commenced this action by filing an unfair labor

practice charge with the Board's Regional Director. After

investigating the charge, the Regional Director filed a complaint

with the Board, claiming that HR 4.06 illegally discriminates

against union members in violation of section 8(a)(3) and (1).2

An Administrative Law Judge ("ALJ") held an evidentiary hearing

and issued a decision sustaining the charge in June 2013. A

divided three-member panel of the Board largely affirmed the ALJ's

ruling on September 16, 2015. Accordingly, the Board ordered

Southcoast to rescind HR 4.06 and provide affirmative relief to

Souza, Nunes, and other similarly situated members of the union.

This appeal followed.

 II. STANDARD OF REVIEW

 Decisions of the Board must be based on a solid legal

foundation, they must be supported by substantial evidence, and

2 The complaint also asserted that Southcoast independently
violated section 8(a)(1) of the NLRA but the charge was not
sustained by the Board and it has no bearing on this appeal.

 - 7 -
they must be the product of reasoning that is neither arbitrary

nor capricious. See Boch Imports, Inc. v. NLRB, 826 F.3d 558, 565

(1st Cir. 2016).

 Substantial evidence exists where there is "such

relevant evidence as a reasonable mind might accept as adequate to

support a conclusion." NLRB v. Hotel Emps. & Rest. Emps. Int'l

Union Local 26, 446 F.3d 200, 206 (1st Cir. 2006) (quoting McGaw

of P.R., Inc. v. NLRB, 135 F.3d 1, 7 (1st Cir. 1997)); see also

Allentown Mack Sales & Serv., Inc. v. NLRB, 522 U.S. 359, 366–67

(1998) ("[W]e must decide whether on this record it would have

been possible for a reasonable jury to reach the Board's

conclusion."). When determining whether substantial evidence

supports the Board's conclusions, "[w]e must take contradictory

evidence in the record into account." NLRB v. Int'l Bhd. of

Teamsters, Local 251, 691 F.3d 49, 55 (1st Cir. 2012) (alteration

in original) (quoting Howard Johnson Co. v. NLRB, 702 F.2d 1, 2

(1st Cir. 1983)). "[W]e may not 'displace the Board's choice

between two fairly conflicting views, even though [we] would

justifiably have made a different choice had the matter been before

[us] de novo.'" NLRB v. NSTAR Elec. Co., 798 F.3d 1, 11 (1st Cir.

2015) (second and third alterations in original) (quoting

Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)).

 - 8 -
Nevertheless, "the Board 'is not free to prescribe what inferences

from the evidence it will accept and reject, but must draw all

those inferences that the evidence fairly demands.'" Local 251,

691 F.3d at 55 (quoting Allentown Mack, 522 U.S. at 378).

 The Board's reasoning must also conform to the

Administrative Procedure Act's "scheme of 'reasoned

decisionmaking.'" Allentown Mack, 522 U.S. at 374 (quoting Motor

Vehicle Mfrs. Assn. of U.S., Inc. v. State Farm Mut. Auto. Ins.

Co., 463 U.S. 29, 52 (1983)). Under this scheme, we must reject

the Board's reasoning where it is "arbitrary, capricious, an abuse

of discretion, or otherwise not in accordance with law." 5 U.S.C.

§ 706(2)(A); see also Sig Sauer, Inc. v. Brandon, 826 F.3d 598,

601 (1st Cir. 2016). "A decision is arbitrary and capricious 'if

the agency has relied on factors which Congress has not intended

it to consider, entirely failed to consider an important aspect of

the problem, offered an explanation for its decision that runs

counter to the evidence before the agency, or is so implausible

that it could not be ascribed to a difference in view or the

product of agency expertise.'" Craker v. Drug Enf't Admin., 714

F.3d 17, 26 (1st Cir. 2013) (quoting State Farm, 463 U.S. at 43).

A Board decision cannot survive review unless the Board

"articulate[s] a satisfactory explanation for its action including

 - 9 -
a 'rational connection between the facts found and the choice

made.'" Grosso v. Surface Transp. Bd., 804 F.3d 110, 116 (1st

Cir. 2015) (quoting State Farm, 463 U.S. at 43). In the end,

"[r]eview under the arbitrary and capricious standard is narrow

and [we] may not substitute [our] judgment for that of the agency,

even if [we] disagree[] with the agency's conclusions." River St.

Donuts, LLC v. Napolitano, 558 F.3d 111, 114 (1st Cir. 2009).

 III. ANALYSIS

 This case is founded on a claim that HR 4.06 improperly

discriminates against union workers at Southcoast in violation of

section 8(a)(3) and (1) of the NLRA. Southcoast argues on appeal

that the Board acted arbitrarily and without substantial evidence

when it rejected Southcoast's contention that HR 4.06 serves its

legitimate and substantial business interests. We resolve such

disputes by using the analytical framework established by the

Supreme Court in NLRB v. Great Dane Trailers, Inc., 388 U.S. 26

(1967). See NLRB v. Borden, Inc. (Borden I), 600 F.2d 313, 320

(1st Cir. 1979). Accordingly, we begin by describing the Great

Dane framework and then delve into the details of the parties'

respective arguments.

 The Court explained in Great Dane that "discrimination

and a resulting discouragement of union membership" are necessary

 - 10 -
but not sufficient conditions to support a claim under section

8(a)(3) and (1). See id. at 32–33. A viable discrimination claim

also ordinarily requires proof that "the discriminatory conduct

was motivated by an antiunion purpose." Id. at 33; see also Radio

Officers' Union of Commercial Telegraphers Union v. NLRB, 347 U.S.

17, 44 (1954) ("That Congress intended the employer's purpose in

discriminating to be controlling is clear."). The general rule,

however, is subject to exceptions. If the employer's conduct is

"inherently destructive" of union members' rights under section 7

of the NLRA, 29 U.S.C. § 157, a violation may be proved without

evidence of improper motive if the employer fails to prove that

its actions can be justified as "something different than they

appear on their face." Great Dane, 388 U.S. at 33 (quoting NLRB

v. Erie Resistor Corp., 373 U.S. 221, 228 (1963)). Even if a

business justification has been proved, an inference of improper

motive may be drawn from the inherently destructive conduct itself

and the Board remains free to "strike the proper balance between

the asserted business justifications and the invasion of employee

rights in light of the Act and its policy." Id. at 33–34.

 If instead the harm to union members' interests is

"comparatively slight," an employer must respond to a

discrimination charge with evidence that the challenged conduct

 - 11 -
serves "legitimate and substantial" business interests. Id. at

34. A failure to meet this burden will result in a finding of

liability without the need for evidence of improper motive. Id.

But if a satisfactory business justification is proved, a violation

cannot be established without proof of antiunion motivation. Id.

Thus, when a challenged employment policy has only a comparatively

slight effect on section 7 rights, a legitimate and substantial

business justification has been proved, and no evidence of a

discriminatory motive has been presented, the Board must allow the

policy to stand without attempting to balance business

justifications against employee interests.

 Here, the Board does not argue that HR 4.06 is inherently

destructive of union members' section 7 rights. Nor does the Board

contend that the policy is the product of antiunion bias. Instead,

it defends its ruling solely by claiming that Southcoast failed to

prove that HR 4.06 serves a legitimate and substantial business

interest. Accordingly, it is to this issue that we now turn.

 Southcoast justifies HR 4.06 principally by claiming

that it helps level the playing field between union and nonunion

workers.3 Because a nonunion employee cannot be considered for a

 3Southcoast also asserts it enacted HR 4.06 to reduce
complaints from nonunion employees about the union's hiring
preference. In rejecting this proposed justification, the Board
 - 12 -
union position unless no qualified union member applies for the

position, Southcoast argues, it is only fair to grant nonunion

employees a similar hiring preference when filling nonunion

positions.

 The Board did not question Southcoast's contention that

HR 4.06 treats nonunion workers more like union workers than would

otherwise be the case. Instead, it rejected Southcoast's level-

playing-field justification because it determined that the policy

goes too far and instead "does the opposite of 'level the playing

field'" by disproportionately favoring nonunion employees over

their union counterparts. Southcoast Hosps. Grp., 363 N.L.R.B.

No. 9, 2015 WL 5451459, at *3 (Sept. 16, 2015). The Board based

this determination on two subsidiary factual findings. First, it

noted that the number of positions covered by HR 4.06 "pales in

comparison" to the number of positions covered by the union hiring

policy. Id. Second, the Board determined that HR 4.06 is unfair

because it grants nonunion workers a hiring preference for vacant

branded HR 4.06 a "solution in search of a problem" because
Southcoast was unable to identify any nonunion employee who had
complained about the union hiring policy. Southcoast Hosps. Grp.,
363 N.L.R.B. No. 9, 2015 WL 5451459, at *3 (Sept. 16, 2015). We
need not evaluate the Board's conclusion on this point because, as
we explain below, the Board improperly rejected Southcoast's
alternative justification for HR 4.06.

 - 13 -
jobs at two facilities whereas the union hiring preference only

covers jobs at a single facility. Id. These facts are

significant, the Board reasoned, because they leave union members

with a more limited "universe of job opportunities." Id. at *3

n.5. We conclude that these findings cannot serve as substantial

evidence for the Board's decision.

 HR 4.06 covers many more positions than the union hiring

policy but it is by no means clear that this difference unfairly

disadvantages union workers. As Board Member Miscimarra correctly

noted in his dissent below, the probability that a covered employee

will obtain a successful transfer under either policy cannot be

determined by considering the number of positions covered by the

policy without also accounting for the number of employees that

the policy covers. See id. at *8 (Miscimarra, Member, dissenting

in part). Because the ratio of covered positions to covered

employees is substantially the same under both HR 4.06 and the

union hiring policy, one cannot say that a nonunion employee is

necessarily more likely than a union employee to obtain a

successful transfer simply because HR 4.06 covers more positions.

The Board appeared to concede this point in responding to the

dissent when it stated that "HR 4.06 has a negative effect on

represented employees, not because it makes it more difficult to

 - 14 -
be selected for a transfer, but because it limits the universe of

job opportunities." Id. at *3 n.5.

 The problem with the Board's reasoning is that it failed

to further explain why union workers are disproportionately harmed

by HR 4.06 simply because it covers more positions than are covered

by the union hiring policy. As far as the record reflects, HR

4.06 discriminates against union employees just as the union hiring

preference discriminates against nonunion employees. If the fact

that HR 4.06 covers more positions than are covered under the union

hiring policy does not leave a nonunion worker with a higher

probability of a successful transfer than her union counterpart,

it is not apparent from the record that this aspect of HR 4.06

unfairly disfavors union workers. Accordingly, a finding that HR

4.06 covers more positions than are covered by the union hiring

policy cannot by itself justify the Board's conclusion that the

policy tilts the playing field too far in favor of nonunion

workers.4

 The Board also determined that HR 4.06 benefits nonunion

workers at the expense of union workers because it gives nonunion

 4 We note here that if there were evidence in the record of a
substantial qualitative difference between the jobs available at
Tobey and the other facilities, for example, this might be a
different case — but no such evidence was presented to the Board.
 - 15 -
workers a hiring preference for jobs at two facilities, whereas

the union hiring preference covers only a single facility. Here

again, the Board did not disclose its reasoning in its decision,

except by noting that HR 4.06 "limits the universe of job

opportunities" for union workers. Id. at *3 n.5. On appeal,

however, it attempts to fill the gap with two arguments. First,

it suggests that the dual-facility preference unfairly penalizes

union workers because they are impeded from transferring to two

facilities, whereas nonunion workers are only impeded from

transferring to one. Second, the Board argues that a single-

facility preference would be more beneficial to union members than

the current dual-facility preference because "it would reduce the

number of applicants who receive a preference over them for vacant

positions at St. Luke's and Charlton."

 On this sparse record, the Board's observation that HR

4.06 provides nonunion workers with preference at two facilities

is simply another form of its observation that HR 4.06 provides

preference for more positions. One might equally observe that HR

4.06 provides preference for more floors. In each case, the

logical inquiry should be whether the ratio of material

opportunities overall as compared to the number of people competing

for those opportunities (and thus the chances of a given worker to

 - 16 -
benefit equally from his or her respective preference) is greater

for nonunion workers than for union workers. As we have explained,

merely noting that there are more opportunities — whether expressed

in units of positions, floors, or facilities — by itself says

little of relevance where the competitors for those opportunities

are correspondingly aggregated. Thus, while nonunion workers get

preference at two hospitals, they must also compete with workers

from two hospitals, while the union workers, with preference at

only one hospital, need compete only with workers from that

hospital.

 It is also troubling that the Board concluded that HR

4.06 tipped the playing field too far in favor of nonunion workers

without making any attempt to determine how its judgment might be

affected by other aspects of the hiring policies that leave union

members at a comparative advantage. For example, HR 4.06 entitles

Southcoast to select the best qualified candidate for a vacant

nonunion position, even though qualified nonunion employees have

also applied for the position. In contrast, Southcoast is required

under the union hiring preference to hire the most senior,

qualified union applicant for a vacant union position even if more

qualified nonunion applicants have applied. Southcoast also

grants union members preferential consideration over nonemployee

 - 17 -
applicants when filling nonunion jobs, whereas the record contains

limited, if any, evidence that Southcoast affords nonunion

employees a similar preference when filing union positions. In

addition, HR 4.06 gives the union the right to have its members

treated as regular-status Internal Applicants by agreeing to

surrender its hiring preference for union positions.5

 In rejecting HR 4.06, the Board focused its analysis

solely on the greater number of employees and facilities covered

by the nonunion hiring preference without also considering aspects

of the policy that continue to leave nonunion employees less well

off than their union counterparts. Two minor differences between

HR 4.06 and the union's hiring policy that have little, if any,

adverse effect on union members cannot serve as substantial

evidence for a determination that HR 4.06 tilts the playing field

too far in favor of nonunion employees when other unexamined

differences between the policies continue to leave union members

with a comparative advantage when they apply for vacant positions.

 The Board nevertheless defends its decision by claiming

in its brief on appeal that "[w]here an employer's discriminatory

action is not necessary to achieve its stated goal, it lacks a

 5 The fact that the union did not so elect may well suggest
that it sees the current playing field as still slightly tipped in
its direction.
 - 18 -
legitimate and substantial business justification." It then

argues that it was entitled to reject Southcoast's level-playing-

field justification because Southcoast could have achieved its

stated goal through less restrictive means by limiting its nonunion

workers to only a single-facility hiring preference. We reject

this argument because, as we have already explained, nothing in

the record supports the conclusion that nonunion workers are given

greater or more opportunities than union workers.

 In Borden I, we reminded the Board that "it is neither

our function nor the Board's to second-guess business decisions."

Id. at 321.6 While the Board remains free to reject a proffered

business justification on the ground that it is "illogical," NLRB

v. Borden, Inc. (Borden II), 645 F.2d 87, 88 (1st Cir. 1981), or

that is not "reasonably adapted to the achievement of a legitimate

end," NLRB v. Brown, 380 U.S. 278, 289 (1965), it may not

 6 The Board contends that we disavowed Borden I in Statler
Indus., Inc. v. NLRB, 644 F.2d 902, 905 n.4 (1st Cir. 1981)
(subsequent history omitted). Our criticism of Borden I in
Statler, however, was limited to a single sentence in the opinion
that purported to address how the Board should resolve the claim
on remand that the employer acted with an improper motivation if
the employer was able to demonstrate that the challenged policy
also serves a legitimate and substantial business interest. Here,
the Board does not seek to defend its decision by arguing that HR
4.06 was the product of antiunion motivation. Accordingly, our
criticism of Borden I in Statler, has no bearing on the resolution
of the present case.

 - 19 -
invalidate an employment policy that accomplishes a legitimate

goal in a nondiscriminatory manner merely because the Board might

see other ways to do it.

 Southcoast adopted HR 4.06 in an effort to treat its

union and nonunion workers more even-handedly when filling vacant

positions. HR 4.06 achieves this goal by treating nonunion

employees more like union members than they otherwise would be

treated. Because Southcoast's chosen method was reasonably

adapted to achieve its stated goal, the Board lacked the power to

reject HR 4.06 simply because it is not identical to the union

hiring policy or because Southcoast might have achieved its goal

through alternative means that were more beneficial to its union

employees.

 IV. CONCLUSION
 The Board's Decision and Order requiring Southcoast to

rescind HR 4.06 and granting affirmative relief to affected

employees is not supported by substantial evidence. Accordingly,

the decision is vacated and the case is remanded for further

proceedings consistent with this opinion.

 - 20 -