PROVIDENCE HOSPITAL and Mercy Hospital, Petitioners, Cross–Respondents,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent, Cross–Petitioner.

No. 96–1198.

United States Court of Appeals, First Circuit.

Heard July 31, 1996.

Decided Aug. 28, 1996.

Maurice M. Cahillane, Springfield, MA, with whom Egan, Flanagan and Cohen, P.C. was on brief, for petitioners and cross-respondents.

Vincent Falvo, Utica, NY, with whom Frederick L. Feinstein, General Counsel, Washington, DC, Linda Sher, Associate General Counsel, South Euclid, OH, Aileen A. Armstrong, Deputy Associate General Counsel, Linda J. Dreeben, Supervisory Attorney, and Lisa R. Shearin, Attorney, Washington, DC, National Labor Relations Board, were on brief, for respondent and cross-petitioner.

Before SELYA and BOUDIN, Circuit Judges, and McAULIFFE,* District Judge.

* Of the District of New Hampshire, sitting by designation.

SELYA, Circuit Judge.

Petitioners and cross-respondents, Providence Hospital and Mercy Hospital (collectively, the Hospitals), seek judicial review of an adverse administrative determination. We deny the petition and enforce the order of respondent and cross-petitioner, the National Labor Relations Board (the Board).

## I. BACKGROUND

The Hospitals are members of the Sisters of Providence Health System (SPHS), a chain of not-for-profit institutions operating in western Massachusetts. The Hospitals' nursing staffs are unionized and the Massachusetts Nurses Association (MNA) represents the nurses. Spurred by rumors of an impending consolidation, an MNA representative, Shirley Astle, wrote to the president of Mercy Hospital on August 11, 1993, requesting relevant particulars. The hospital responded that it was too early to predict the changes that might result from a consolidation, and that in all events a reduction in force would likely be restricted to management personnel.

Shortly thereafter SPHS announced plans to consolidate the Hospitals' administrations. As the first step in the pavane, it appointed Vincent McCorkle as president and chief executive officer of both institutions. A letter dated September 28, 1993, sent to the union by a member of the newly unified management team, confirmed the earlier assurance that, although management would be "look[ing] at ways to integrate how [the Hospitals] provide care," there were no definite plans to downsize the bargaining units. It was simply "too early to determine the nature and extent of any potential impact on employee working conditions."

On February 24, 1994, McCorkle sent a letter to the Hospitals' combined work force. The letter informed the employees of a perceived "need to adjust ... staffing levels" and suggested that this adjustment would be accomplished at least in part by reduction in force.[1] Roughly three weeks thereafter the

---

1. The communique added that the Hospitals had intended to delay informing workers about these

Hospitals advised local media outlets that some 200 positions would be eliminated as part of the ongoing consolidation. A second press release, distributed later that same week, indicated that despite management's earlier assurances 198 Mercy Hospital employees and six Providence Hospital employees had been cashiered.[2]

On the very day that McCorkle first announced the impending reduction in force, SPHS and a competing health-care system, Holyoke–Chicopee Area Health Resources (HCAHR), signed a memorandum of understanding (MOU) commemorating their intent to merge. McCorkle informed the Hospitals' employees of the planned merger on February 25, 1994. Although this statement hinted at a further reorganization and possible future efficiencies of scale, McCorkle claimed that no decisions had been made regarding future staffing. In short order, SPHS and HCAHR submitted applications to federal and state agencies in an endeavor to gain necessary regulatory approvals.

On May 5, 1994—with layoffs a reality and with a merger now in the offing—Astle requested a copy of SPHS's "business plan," saying that the MNA wanted "to begin its assessment of the merger's impact on the conditions of work for the RNs MNA represents at Providence and Mercy Hospitals." McCorkle temporized while forwarding the request to counsel. Astle wrote again on May 24, complaining that she had received no substantive response. The Hospitals' lawyer finally replied on June 2, but he gave MNA's request the back of his hand; the attorney took the position that SPHS "is a totally separate corporation," and, therefore, the Hospitals did not have access to a copy of the desired document (if, indeed, such a document existed).

MNA chose not to quibble. Instead, it renewed its request in somewhat altered form. In letters dated July 26 and August 5, respectively, it set forth a particularized listing of documents that it wished to examine, a detailed statement of the reasons underlying its information requests, and the legal basis upon which the requests rested.[3] Regarding the internal consolidation, MNA asked that the Hospitals provide copies of (1) all documents relating to the consolidation (or in lieu thereof, a detailed explanation of the consolidation); (2) any plans for further work force reductions at Mercy Hospital; and (3) any plans regarding changes in the Hospitals' corporate status. As to the anticipated merger with HCAHR, MNA sought (1) copies of the MOU and other documents explicating the merger's terms; (2) plans for, or information about, proposed staffing changes at Mercy Hospital in consequence of this merger; and (3) all documents pertaining to the Hospitals' proposed corporate status within the merged group of facilities. Each request solicited a response within ten days.

The Hospitals asserted that they needed additional time to formulate a meaningful response. MNA waited patiently for more than a month before sending a follow-up letter on September 12. Receiving no immediate response, the union then filed charges with the Board. As the Board's processing of the charging papers drew to a close, the Hospitals provided MNA with some—but not all—of the requested data, characterizing their December 29 transmittal as a "response to the NLRB information charge." The Board's regional director issued a formal complaint ten days later. In May 1995—on the eve of the NLRB hearing—the Hospitals supplied MNA with materials explaining their corporate structure and reaffirming that no further layoffs would result from the internal consolidation. They furnished no

---

layoffs until plans crystallized, but that a threatened news leak forced management's hand.

2. The record indicates that thirty-eight of the individuals laid off at Mercy were nurses. The record is silent, however, as to whether any nurses were laid off at Providence.

3. Sandwiched between these requests was a letter from McCorkle to the Hospitals' employees

offering insights anent the proposed merger. In this missive, dated July 29, 1994, McCorkle acknowledged that some departments would be amalgamated but predicted that "most jobs will be saved and moved within the new system." An attachment hinted at possible future reductions in force (though claiming that "right now, we have no game plan for layoffs").

data relating to the proposed merger with HCAHR.

The matter was heard by an administrative law judge (ALJ) who took evidence and reserved judgment. Three months elapsed before the ALJ issued his decision. In the interim HCAHR purported to terminate the MOU. Displeased no little and quite some, SPHS filed suit in state court alleging breach of the MOU and seeking, *inter alia,* specific performance.

## II. THE BOARD'S DECISION

In September 1995 the ALJ published his findings and a proposed order. He determined that the Hospitals had breached their duty to bargain in good faith by withholding information relevant to the performance of the union's undertakings as a collective bargaining representative, and had thereby violated the National Labor Relations Act (NLRA), specifically, 29 U.S.C. § 158(a)(1) & (5).

The Hospitals took exception to the decision and appealed to the Board. The Board adopted the ALJ's findings and rationale,[4] albeit modifying the recommended order slightly. *See Providence Hosp.,* 320 N.L.R.B. No. 60, 1996 WL 48263, at *1 (Jan. 31, 1996). In light of this adoption, we recount those findings as if they were made *ab initio* by the Board.

The Board first addressed MNA's requests for information regarding the internal consolidation. It adjudged this information relevant because MNA might well have needed it "so that it could determine what legal effect if any [the consolidation] would have on its collective-bargaining agreements with the hospitals, when it should demand bargaining over the effects of the transaction," and what effect the restructuring would have on the bargaining units. *See id.* at *7. Turning to the requests regarding the proposed merger, the Board found that information to be relevant, even though not directly linked to terms and conditions of employment. *See id.* at *8. It explained that "MNA needed to know the impact of the proposed [merger] on

its contracts," as well as any other possible effects on the status of the bargaining units. *Id.* at *9. Moreover, McCorkle's letters to the employees suggested the possibility "that some decisions might have been made which would affect bargaining unit employees." *Id.*

## III. DISCUSSION

We start by reiterating the deferential standard that obtains when federal courts review orders of the Board. Then, before moving to specifics, we discuss in general terms the scope of an employer's duty to disclose relevant information to an inquiring union.

### A. The Standard of Review.

When a party challenges the Board's determination that it has committed an unfair labor practice, an inquiring court must scrutinize the record as a whole. As to matters of fact, the court should uphold the Board's findings if they are supported by substantial evidence. *See Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 464–65, 95 L.Ed. 456 (1951); *Teamsters Local Union No. 42 v. NLRB,* 825 F.2d 608, 612 (1st Cir.1987). As to matters of law, appellate review is plenary. Nevertheless, appellate courts ordinarily should defer to the Board's interpretations of the statutes it must enforce, such as the NLRA, whenever such interpretations flow rationally from statutory text. *See NLRB v. Town & Country Elec., Inc.,* — U.S. ——, ——, 116 S.Ct. 450, 453, 133 L.Ed.2d 371 (1995); *NLRB v. Curtin Matheson Scientific, Inc.,* 494 U.S. 775, 778 n. 2, 110 S.Ct. 1542, 1545 n. 2, 108 L.Ed.2d 801 (1990).

### B. The Duty to Disclose.

The NLRA imposes upon employers and unions alike a duty to bargain in good faith over "wages, hours, and other terms and conditions of employment." 29 U.S.C. § 158(d). The right to bargain collectively would be little more than a hollow promise if a bargaining representative did not have the

---

4. The Board is not obliged to make independent findings or conduct its own analysis of the factors prompting an order where, as here, it expressly adopts the ALJ's findings and reasoning. *See NLRB v. Horizon Air Servs., Inc.,* 761 F.2d 22, 24 n. 1 (1st Cir.1985).

concomitant right to muster the information needed to conduct that bargaining effectively. Thus, "[t]he duty to bargain collectively ... includes a duty to provide relevant information needed by a labor union for the proper performance of its duties as the employees' bargaining representative." *Detroit Edison Co. v. NLRB*, 440 U.S. 301, 303, 99 S.Ct. 1123, 1125, 59 L.Ed.2d 333 (1979). A breach of this duty constitutes an unfair labor practice under 29 U.S.C. § 158(a)(5).

■ Stating the rule is not a surefire means of dispelling all uncertainty. Relevance, like beauty, sometimes lies in the eye of the beholder, and parties can differ about what information is (or is not) relevant to a union's functions *qua* bargaining agent. Stated in traditional terms, requested information is relevant if it seems probable that the information will be of legitimate use to the union in carrying out its duties and responsibilities *qua* bargaining agent. *See NLRB v. Acme Indus. Co.*, 385 U.S. 432, 437, 87 S.Ct. 565, 568–69, 17 L.Ed.2d 495 (1967). Put another way, requested information should be deemed relevant if it is likely to be of material assistance in evaluating strategies that may be open to the union as part of its struggle to minimize the adverse effects of the employer's decisionmaking process on persons within the bargaining unit. *See Western Mass. Elec. Co. v. NLRB*, 589 F.2d 42, 48 (1st Cir.1978). These liberal formulations of the test make manifest that the relevancy threshold is low and that the standard is neither onerous in nature nor stringent in application.[5] This is as it should be, for a union cannot be expected to chart a prudent course without reliable and reasonably specific information about the employer's plans.

■ The Board and the courts have put a gloss on the test for relevancy—a gloss that alters the burden of persuasion depending upon the nature of the data sought by the union. When "the requested information concerns wages and related information for employees in the bargaining unit, the information is presumptively relevant to bargainable issues." *Soule Glass & Glazing Co. v. NLRB*, 652 F.2d 1055, 1093 (1st Cir.1981) (citation and internal quotation marks omitted). In such cases the employer must either disprove relevance or explain why it cannot furnish the information. *See, e.g., NLRB v. Borden, Inc.*, 600 F.2d 313, 317 (1st Cir.1979). By contrast, when the requested information only indirectly implicates the terms and conditions of employment, it is the union's burden to demonstrate the relevance of the information to the performance of its statutory obligations. *See Western Mass. Elec.*, 573 F.2d at 105. Despite this dichotomy, however, the ultimate standard of relevancy does not vary. Moreover, in both situations it is necessary to measure relevance under the totality of the circumstances that obtain in a particular case. *See NLRB v. Truitt Mfg. Co.*, 351 U.S. 149, 153–54, 76 S.Ct. 753, 756–57, 100 L.Ed. 1027 (1956).

Once the Board has made its assessment of whether particular information must be produced, the standard of review looms large. At that juncture, a reviewing court should accord considerable respect both to the Board's determination and to the factual findings underpinning it. *See NLRB v. New England Newspapers, Inc.*, 856 F.2d 409, 414 (1st Cir.1988).

### C. The Merits.

It is against this backdrop that we mull the assignments of error. The Hospitals interpose both relevancy and confidentiality objections to the Board's decision concerning the requests for merger-related information. They lodge relevancy and substantial compliance objections to the Board's decision concerning the requests for consolidation-related information. Finally, they question the scope of the Board's order. Although the applicable legal principles overlap, we treat these five points separately.

---

**5.** The standard is analogous to the relevancy standard that governs in the pretrial discovery process, under which discovery initiatives are deemed relevant as long as they seem calculated to lead to the unearthing of admissible evidence.

*See Acme Indus.*, 385 U.S. at 437, 87 S.Ct. at 568–69 (approving "discovery-type standard"); *NLRB v. New England Newspapers, Inc.*, 856 F.2d 409, 414 n. 4 (1st Cir.1988) (same).

**1. Relevance of the Planned Merger.** The Hospitals' relevancy objection to the compulsory sharing of merger-related information is painted with too broad a brush. Whatever generalities may pertain to proposed mergers in the abstract, the concrete (and somewhat unusual) factual circumstances surrounding this proposed merger afford substantial evidence adequate to support the Board's order.

To be sure, certain management actions that ultimately may have a significant impact on the terms and conditions of employment within the bargaining unit are nonetheless beyond the purview of collective bargaining. In a much-quoted turn of phrase, Justice Stewart referred to these actions as comprising "the core of entrepreneurial control." *Fibreboard Paper Prods. Corp. v. NLRB,* 379 U.S. 203, 223, 85 S.Ct. 398, 409, 13 L.Ed.2d 233 (1964) (Stewart, J., concurring). The thesis holds that important management decisions, such as choosing a marketing strategy or liquidating lines of business, are not concinnous subjects for mandatory collective bargaining because they "are fundamental to the basic direction of [the] corporate enterprise." *Id.* The components forming this core of entrepreneurial control are often classified as comprising matters that are "akin to the decision whether to be in business at all." *First National Maint. Corp. v. NLRB,* 452 U.S. 666, 677, 101 S.Ct. 2573, 2580, 69 L.Ed.2d 318 (1981). And while such matters are not primarily addressed to conditions of employment, they may have effects—sometimes profound effects—upon those conditions.

Although the content of this core of entrepreneurial control eludes a precise description, *see United Food & Commercial Workers, Etc. v. NLRB,* 1 F.3d 24, 30–33 (D.C.Cir. 1993), it is plain that the decision to merge two unrelated corporate entities falls within it. *See International Ass'n of Machinists &*

*Aerospace Workers v. Northeast Airlines, Inc.,* 473 F.2d 549, 556–57 (1st Cir.), *cert. denied,* 409 U.S. 845, 93 S.Ct. 48, 34 L.Ed.2d 85 (1972).[6] Thus, MNA had no right either to veto the decision to merge or to request information for the purpose of intruding into the negotiations between the merger partners (SPHS and HCAHR).

■ Still, there is an important distinction between the right to bargain about a core entrepreneurial business decision (a right which a union does not possess) and the right to bargain about the effects of that decision on employees within a bargaining unit (a right which, depending upon the overall circumstances, a union may possess). After all, subject to considerations such as relevancy and immediacy, unions generally enjoy the right to bargain over the effects of decisions which are not themselves mandatory subjects of collective bargaining. *See First National Maint.,* 452 U.S. at 681, 101 S.Ct. at 2582; *Northeast Airlines,* 473 F.2d at 557. It follows that, even when a particular managerial decision is not itself a mandatory subject of bargaining, the decision's forecasted impact on salaries, employment levels, or other terms and conditions of employment may constitute a mandatory subject of collective bargaining. *See, e.g., Holly Farms Corp. v. NLRB,* 48 F.3d 1360, 1368 (4th Cir.1995), *aff'd,* —— U.S. ——, 116 S.Ct. 1396, 134 L.Ed.2d 593 (1996); *New England Newspapers,* 856 F.2d at 413; *Penntech Papers, Inc. v. NLRB,* 706 F.2d 18, 26 (1st Cir.), *cert. denied,* 464 U.S. 892, 104 S.Ct. 237, 78 L.Ed.2d 228 (1983). Embracing this tenet, MNA contends that its requests for merger-related information were relevant to "effects bargaining," and therefore should have been honored.

In an effort to parry the union's thrust, the Hospitals offer two reasons why MNA could not properly predicate these information requests on a desire to engage in effects bar-

---

**6.** We think that mergers involving independent entities are to be distinguished from internal consolidations involving a combination or realignment of subsidiaries owned by a common parent. Such internal consolidations do not require the same degree of "secrecy, flexibility and quickness" that, according to *Northeast Airlines,* 473 F.2d at 557, renders arm's-length mergers

not easily susceptible of collective bargaining. In any event, the Hospitals do not contend that the decision to consolidate internally, as opposed to the decision to merge with an external partner, comes within the core of entrepreneurial control, and, accordingly, we express no opinion on the topic.

gaining. They suggest that (1) such bargaining always must await the culmination of a pending merger (and here, the parties have not finalized the transaction and may never do so), and (2) even if a pending merger can sometimes be an appropriate subject of effects bargaining, the prospects of this particular merger are too dim and its outline too amorphous to warrant a finding of relevancy (especially since restraint-of-trade laws may limit any detailed discussions of operating efficiencies until the merger is consummated). In our view, neither suggestion is convincing.

■ The Hospitals' contention that effects bargaining (or, more accurately, the gathering of information preliminary to effects bargaining) always must await the consummation of a merger depends almost entirely on their reading of our decision in *Northeast Airlines*. That decision however, is incapable of carrying the cargo that the Hospitals load on it. For one thing, the question that we discussed in *Northeast Airlines* arose in a materially different legal posture. There we affirmed the district court's denial of an injunction sought by a union as a means of preventing the merger of the employer into an independent company. *See Northeast Airlines*, 473 F.2d at 558. We hung our decision on the district court's balancing of the equities—standard fare in cases seeking injunctive relief. For another thing, the union's goal in the *Northeast Airlines* case was to require the employer to incorporate the union's views into the framework of the contemplated merger. *See id.* Here, however, the union sought neither to halt the merger nor to meddle in the negotiations between the merging entities.[7] Because considerations not present here informed the *Northeast Airlines* court's discussion of the core of entrepreneurial control, we think that *Northeast Airlines* can be reconciled easily with authority (to which we subscribe) holding that, as long as a pending merger is suffi-

ciently advanced, a union is entitled to request information shown by the totality of the circumstances to be relevant in order to prepare for effects bargaining. *See Holly Farms*, 48 F.3d at 1360 (upholding Board's finding that employer's failure to produce merger agreement when requested premerger constituted an unfair labor practice) (enforcing 311 N.L.R.B. 273, 350, 1993 WL 193740 (1993)); *Children's Hosp. of San Francisco*, 312 N.L.R.B. 920, 923, 1993 WL 398480 (1993) (ordering disclosure of merger agreement because its contents, even before the merger was consummated, "clearly would have influenced [the union] as to negotiating tactics, positions, and demands").

■ This brings us to the Hospitals' second argument. It is common ground that a union cannot demand bargaining over effects that are purely speculative, ephemeral, or too far removed from the underlying activity. *See Detroit Edison*, 440 U.S. at 314–15, 99 S.Ct. at 1130–31; *Northeast Airlines*, 473 F.2d at 558. But in this instance, the Hospitals themselves presented the planned merger to their employees and to the media as a fait accompli. Their press release spoke in categorical terms, and a subsequent memorandum sent by McCorkle to the employees crowed that the governing boards of both merger partners "have given final approval to the proposed [transaction]," subject only to regulatory clearances (which, we note, were subsequently procured). The same communique mentioned "some specifics" about the system that would result from the merger, including (1) the partners' plans to "combin[e] some acute care, non-acute care, and administrative services" across facilities, and (2) McCorkle's prediction that "most jobs will be saved and moved within the new System." A newsletter distributed by the Hospitals in the same time frame suggested that the merger would be completed in three to six months. It informed the work force that, although "right now, [SPHS and

---

7. Another difference—but one to which we attach little weight—is that *Northeast Airlines* involved the Railway Labor Act (RLA), 45 U.S.C. §§ 151–188. We deem it settled that cases brought under the RLA can inform the decisional process under the NLRA. *See, e.g., Trans World Airlines v. Independent Fed. of Flight Attendants,*

489 U.S. 426, 426–27, 109 S.Ct. 1225, 1226–27, 103 L.Ed.2d 456 (1989); *Lebow v. American Trans Air, Inc.,* 86 F.3d 661, 665–66 (7th Cir. 1996); *Brotherhood of Locomotive Engineers v. Kansas City So. Ry. Co.,* 26 F.3d 787, 795 (8th Cir.), *cert. denied,* — U.S. ——, 115 S.Ct. 320, 130 L.Ed.2d 281 (1994).

HCAHR] have no game plan for layoffs," the workers should expect "a significant reallocation of jobs within the new System" at some point.

A union is entitled to plan in advance for likely contingencies. Under the totality of the circumstances that existed here—especially the employer's expressed confidence that the merger would take place soon and the emphasis in its handouts on the reallocation of personnel—we believe it was within the Board's authority to find that the union's professed need for specifics about the merger's probable impact on the bargaining unit was reasonable. *See Union Builders, Inc. v. NLRB*, 68 F.3d 520, 523 (1st Cir.1995) (explaining that employers must "divulge information of even merely potential relevance"). In other words, given management's professed near-certainty that the merger would eventuate and its broad hints that it already had formulated some ideas relative to future staffing of the new system, the Board reasonably could find—as it did—that MNA needed information both about the proposed merger (for the purpose of bargaining over its effects, if and when necessary) and the structural attributes of the new system (to determine whether the collective bargaining agreements would survive the realignment). Thus, substantial evidence supported the Board's endorsement of the union's requests for merger-related information.

■ We add an eschotocol of sorts. The Hospitals claim that the ultimate failure of the merger[8] takes two bites out of the Board's case, serving not only to moot the information requests but also to underscore their prematurity. We are not persuaded. The relevance of requested information must be determined by the circumstances that exist at the time the union makes the request, not by the circumstances that obtain at the time an agency or a court finally vindicates the union's right to divulgement. *See NLRB v. Arkansas Rice Growers Coop. Ass'n*, 400 F.2d 565, 567 (8th Cir.1968); *Mary Thompson Hosp.*, 296 N.L.R.B. 1245, 1250, 1989 WL 224424 (1989), *enforced*, 943 F.2d 741 (7th

Cir.1991). Were the law otherwise, an employer would have a perverse incentive to drag its feet, and a union could lose deserved rights through the ticking of the clock and the delay inherent in the adjudicatory process.

■ **2.** *Confidentiality.* The Hospitals' second line of defense is that the MOU was subject to a side agreement requiring the parties to keep all matters pertaining to the merger secret. We agree with the basic premise on which this defense rests: an employer's commitment to, or genuine need for, confidentiality sometimes can constitute an appropriate reason for keeping documents— even documents that are potentially relevant to the collective bargaining process—out of a union's hands. *See Detroit Edison*, 440 U.S. at 319, 99 S.Ct. at 1133. And when confidentiality is properly put in issue, the Board must carefully balance the employer's need for privacy against the union's need to make informed decisions in its capacity as the employees' bargaining representative. *See New England Newspapers*, 856 F.2d at 413.

■ But there is less here than meets the eye. Because confidentiality is in the nature of an affirmative defense, it is the employer's burden to demonstrate that the requested information is shielded by a legitimate privacy claim. *See Mary Thompson Hosp. v. NLRB*, 943 F.2d 741, 747 (7th Cir. 1991); *see generally Borden*, 600 F.2d at 317 (assuming relevancy, it is the employer's burden to provide some good and sufficient reason why the union's request should be denied). Moreover, to permit the requisite balancing, the employer normally must advance its claim of confidentiality in its response to the union's information request. Only in that way will the parties have a fair opportunity to confront the problem head-on and bargain for a partial disclosure that will satisfy the legitimate concerns of both sides. *See Mary Thompson Hosp.*, 943 F.2d at 747.

■ Setting this principle into motion, the Board has held that it is untimely for an employer to raise a confidentiality objection

---

8. In candor, it is far from clear that the merger is a dead letter. SPHS's suit against HCAHR is still pending in the state court. In its complaint

SPHS terms the MOU "binding" and asks for specific performance.

to an information request for the first time after proceedings before the Board have been commenced. *See Detroit Newspaper Agency*, 317 N.L.R.B. 1071, 1072, 1995 WL 407198 (1995). This protocol represents a responsible application of the statutory duty to bargain in good faith, and we must therefore defer to the Board's expertise. Thus, because the Hospitals failed to follow the proper procedural sequence and neglected to assert a confidentiality objection in their exchange with the union, we reject this line of defense.[9]

### 3. Relevance of the Internal Consolidation.

The Board also found that MNA's requests for information regarding the consolidation were relevant. This finding cannot seriously be questioned.

MNA initially sought this information in the summer of 1993. It honed the information requests and renewed them several times in the succeeding months. Aside from broad denials that the consolidation would have any effect on the bargaining units, management's first substantive response came late in 1994 (after MNA had preferred charges and the Board was on the verge of issuing a complaint). In the intervening fifteen months (during which interval MNA made five separate requests for information about the consolidation) the Hospitals laid off more than 200 workers. In light of the continuing uncertainty about imminent corporate restructuring—uncertainty fed by statements attributable to management—MNA reasonably could have believed that further changes were in the offing. Consequently, the Board plausibly could have found—as it did—that the requested information had great importance to the union and was, therefore, relevant. This is especially so in view of the fact that the collective bargaining agreement at Providence Hospital

expired on December 31, 1994, unless automatically renewed, and MNA had to decide no later than October 1, 1994 whether to allow the contract to renew automatically or to reopen negotiations.

The Hospitals offer no convincing rebuttal to the Board's relevancy finding. As the Board noted, *see Providence Hosp.*, 1996 WL 48263, at *7, the Hospitals' position boils down to a naked assertion that the union had to take management at its word that the organizational changes portended no further alterations in staffing. That is not the way the world works: a union is not bound to accept management's *ipse dixit*, especially when, as now, the totality of the circumstances indicates that something else may be afoot. Here, extensive layoffs had followed past assurances from management, and the union had every reason to probe. It requested information which, if extant, had undeniable relevance for the purpose of effects bargaining. Thus, MNA had a statutory right to receive this information in a timely fashion, or in lieu thereof to receive a contemporaneous written statement as to some legally sufficient reason why it could not be produced (say, that no such information existed or that it was somehow privileged).[10]

### 4. Substantial Compliance.

We dismiss out of hand the Hospitals' suggestion that their belated disclosure of consolidation-related information cures their default. MNA made a series of information requests over a period spanning thirteen months. The Hospitals stonewalled for that entire length of time. They then furnished some information in December of 1994 (after the Board investigation had begun) and some in May of 1995 (on the eve of the hearing). Even assuming *arguendo* that the two batches of belatedly supplied information in the aggregate fulfilled the union's requests, the

---

**9.** The Hospitals' asseveration that they could not explain the need for confidentiality without revealing privileged information proves too much. If that was the case, then the Hospitals were obliged to cite that dilemma in response to the MNA's requests. They did not do so.

**10.** We reject the Hospitals' contention that public availability of the requested information obviated the need for disclosure. The argument is inherently circular: MNA could not possibly

know that all the information was in the public domain if the Hospitals refused to turn over the requested documents or to make any other substantive response. At the very least, the Hospitals had the duty to explain to MNA in a timely fashion that everything was out in the open. As the Board put it, "the Union was entitled to hear that [news] directly from the [Hospitals]." *Providence Hosp.*, 1996 WL 48263, at *8.

**1022**

Hospitals' act of contrition came too late. As the Board explained, the protracted delay that separated the requests from the divulgement of data could "not be attributed to the time needed to assemble the information furnished." *Id.* at *8. A union is entitled to timely disclosure of relevant information. *See Capitol Steel & Iron Co. v. NLRB*, 89 F.3d 692, 697 (10th Cir.1996); *Borden*, 600 F.2d at 318; *Western Mass. Elec.*, 589 F.2d at 46 n. 6. Because the Hospitals failed to provide MNA with relevant documentation regarding the consolidation "as promptly as circumstances allow," *Capitol Steel*, 89 F.3d at 698 (quoting *Decker Coal Co.*, 301 N.L.R.B. 729, 740 (1991)), the Board's finding of an unfair labor practice is unimpugnable.

**5. The Scope of the Order.** We briefly touch upon the Hospitals' objection to the Board's remedial order. Some background is desirable. The ALJ initially recommended that the Hospitals be required to furnish "in a timely fashion, on request, information concerning any proposed affiliation or consolidation of Mercy Hospital and Providence Hospitals with one another and concerning proposed mergers, consolidations, or affiliations of Providence and Mercy Hospitals with other health care providers." *See Providence Hosp.*, 1996 WL 48263, at *11. This language contains an evident ambiguity, raising uncertainty as to whether it applies to all mergers (past and future), or only to the stalled SPHS/HCAHR merger, or strictly to future (indeterminate) mergers. The Board removed this ambiguity, modifying the recommended order "to require the Hospitals to furnish to [MNA] the information requested in [MNA's] requests of July 26 and August 5, 1994." *Id.* at *1 n. 1. To the Board's way of thinking, this modification "more closely reflects the violations found." *Id.*

The modified order responds to the reality that, here, an unusual concatenation of events exist, e.g., the Hospitals' presentation of the merger as a done deal, their insistence that the MOU obligated the signing parties even after HCAHR had repudiated it, and their stonewalling in the face of repeated information requests. What is more, by specifying the information that the Hospitals

must disclose, the Board limits the remedy and leaves future transactions untouched. This step fits neatly with our belief that each situation is *sui generis*, and that pending mergers may or may not be a proper subject of effects bargaining (depending on the individualized circumstances). Based on these considerations, the modification falls well within the Board's province.

## IV. CONCLUSION

We need go no further. For the reasons elucidated above, we hold that the Board's decision and order comport with applicable precedent and are supported by substantial evidence in the record.

***The petition for review is denied. The cross-petition for enforcement is granted. Costs will be taxed in favor of the Board.***