DECISION
This case is before the Court on the Plaintiff's Motion for a Preliminary Injunction to restrain and enjoin the Town of North Providence from closing the fire station located on Douglas Avenue in North Providence. For the reasons set forth herein, the Plaintiff's motion is denied.
 FACTS
The Court makes the following findings of fact for purposes of the Motion for Preliminary Injunction only. The Court is cognizant that litigation may continue, discovery may proceed, and other facts may be established at trial.
The Town of North Providence ("the Town") is a municipality of the State of Rhode Island. The Town has adopted a Home Rule Charter, which vests its mayor with the authority to manage and operate the Town. The ability of the Mayor to operate the daily functions of the Town emanates not only from the Home Rule Charter (Joint Exhibit I) but also from State law. See Town of North Providence, State of Rhode Island Charter ("the Charter"); see,generally *Page 2 
G.L. 1956 § 45-2. In addition to being the Chief Executive and Administrative Head of the local government, the Mayor serves as Director of Public Safety for the town. Charter §§ 3-1-6, 8-1-1.
The Plaintiff, Local 2334 of the International Association of Firefighters, AFL-CIO ("the Union"), is the recognized bargaining agent for the firefighters of the Town. Empowered by the Firefighters Arbitration Act, G.L. 1956 § 28-9.1-1 etseq. ("the FAA"), the Union has broad authority to negotiate on behalf of its members.
The most recent collective bargaining agreement between the Union and the Town (Joint Exhibit 2) expired on June 30, 2009. In August 2009, the Union submitted a list of proposals to the Town (Exhibit 1) for items it wished to include in the new contract. Negotiation meetings between the Union and the Town continued from the summer until November 19, 2009. At that meeting, the Town and the Union agreed that the negotiations were at an impasse. On the same day, the Fire Chief summoned the firefighters' bargaining team to the Town hall, where the Chief informed the Union that he was ordered to close one of the fire stations, Geneva Station 3 on Douglas Avenue ("Station 3.")
On December 1, 2009, the Union received notice that Mayor Lombardi ordered the closure of Station 3 in two days — by December 3. On the morning of December 2, equipment was moved out of Station 3 and the doors were locked by noon. However, no firefighters have lost their jobs as a result of the station closing.
Rhode Island has adopted many of the standards set by the National Fire Proctection Association ("NFPA") in establishing a fire safety code. See, generally G.L 1956 chapter 23-28.01. NFPA Standard 1710 is a recognized industry standard to define appropriate response times for fire departments. Generally, NFPA Standard 1710 requires that the initial engine company arrive on the scene within four minutes and that the full alarm assignment arrive within *Page 3 
eight minutes, for ninety percent of the incidents occurring in the district.[1] Currently, the North Providence Fire Department is well within the requirements of this standard.
Station 3 is located near the center of the Town of North Providence. It covers a designated district which contains residential, commercial, and limited industrial use areas. While the district contains several schools and apartment complexes, it is not an unusual district with unique or ultra-hazardous risks within it. Exhibit 3 illustrates how much of Station 3's district is within the reasonable coverage area for the other stations in the town.
In May 2009, North Providence enlisted the services of Public Safety Solutions, Inc. to conduct an assessment of the fire and emergency medical services provided by the Town. Mr. Leslie Adams is a principal of the firm and testified concerning the firm's report. Having served as a consultant in forty states, Mr. Adams has extensive experience in firefighting, fire department structure, and location of fire stations. Mr. Adams testified that North Providence does not have a fire response problem at present. Rather, he noted that the Town has one of the lowest response times in the state, if not the country. The Adams Report (Joint Exhibit IV) recommended reducing the number of stations in North Providence from four to three, as there was substantial over-coverage for the Town. Even with the closure of Station 3, Mr. Adams concluded that the Town would readily be able to meet the NFPA response time standards. Charts 3.7 and 3.10 (after page 43) of the report show the new district designs. Chart 3.11 illustrates how the new design would still keep the Town within the four minute, first response goal.
Mr. Adams also testified, substantiated by his report, that Station 3 was the least important of the Town's fire stations because its district could be covered by the other stations; *Page 4 
that eliminating one station would not jeopardize firefighter safety; that emergency response would be impacted only minimally; and that there would be no increased risk to public safety. Mr. Adams delivered his report to the Town and testified before the North Providence Town Council on September 3, 2009. On cross examination, Mr. Adams acknowledged that the demand on each station would be increased, but not unreasonably. He testified that the report called for a period of study for his report prior to implementation. He agreed that risks and hazards existed within the district, but most of those risks were normal for a fire district, and North Providence was essentially a residential community.
The Court found Mr. Adams highly credible for several reasons. His report was comprehensive, extensive, and consistent with itself and his testimony. Where a minor defect was found in the report, Mr. Adams did not avoid it. Rather, he acknowledged it or corrected it. He acknowledged, for example, that he could not input all of the specific historical responses into his software analysis, but did complete an analysis of recent response times in the district, focusing on the types of calls.
No positions will be eliminated because of the Station 3 closing. The purpose of the closing is to reduce the costs to the Town, particularly, the costs of operating a fourth station for the fire department.
 REVIEW OF OTHER TESTIMONY
While a complete review of all evidence is not necessary for this Decision, a discussion of some of the testimony is helpful. The Union relies upon a study conducted by Jonathan Moore, an employee of the International Association of Firefighters, at the national headquarters. He was proffered as an expert in fire district design, having completed about fifty studies for station locations in the past. Mr. Moore introduced a number of maps establishing which station *Page 5 
would be "closest appropriate" to respond within four minutes and eight minutes. (Exhibits 4 and 6.) These documents established that Station 3 is the closest station to many areas of the town, and could respond fastest. Two other maps illustrate the response times without the participation of Station 3. (Exhibits 4 through 7). He concluded, at best, that the workload on the remaining fire stations would increase, and that some response times would be delayed. On cross-examination, Mr. Moore acknowledged that he was asked to perform the study recently, and hence the study did not include all of the information which he considered to be essential for a complete analysis. For example, Mr. Moore agreed that he had only recently received a history of recent calls, and time did not permit him to input the calls to produce a more complete risk analysis.
Paul Calderwood also testified on behalf of the Union. Mr. Calderwood has 23 years of experience as a firefighter in Everett, Massachusetts. Prior to retiring from the department, Mr. Calderwood rose to the rank of Deputy Fire Chief. He disagreed with the Adams Report's conclusions on response times, indicating that the report relied too greatly on mutual aid from other localities. Mr. Calderwood also testified that closing the station would threaten firefighter safety by increasing response times, thereby increasing the risk of injury. His basis for this conclusion was that the increased response times would cause firefighters to arrive at the scene of fire emergencies after the start of the incipient stage and there were several target hazards in the area. On cross examination, Mr. Calderwood was not specific about which standards he applied to reach these conclusions. He acknowledged that North Providence does not face unique or unusual fire risks. While Mr. Calderwood firmly stated that firefighter safety depends on prompt response to fire emergencies, he was not clear on what response time would be acceptable to him. He was familiar with the NFPA standards, acknowledged that the proposal *Page 6 
would provide for response times within NFPA standards, and admitted that the standard was appropriate for the area of North Providence affected by the change. Mr. Calderwood did not seem familiar with the rules for Rhode Island mutual aid, or how mutual aid functions day to day.
Mayor Charles Lombardi of the Town was one of the other witnesses. The Mayor was a firefighter for 21 years, and an active participant in the labor negotiations that reached impasse here. He testified that Mr. Adams was retained to prepare his study in or before August of 2009. The Mayor provided a copy of the report to the Fire Chief and assumed that the Fire Chief had shared it with others in the Fire Department. Mayor Lombardi acknowledged that he gave the order to close Station 3 on December 2, though it was known that the station may be closed after the September council meeting. The Mayor also discussed his concerns about the financial situation of the Town. Not firm about his plans for the station, he expected that the mere closing would save $50,000 per year. Renovations to the building were unlikely, but it was possible that other Town departments could be relocated into the building. He acknowledged that he did not discuss the closing with the Union in advance.
 ANALYSIS
When deciding whether to grant a preliminary injunction, this Court considers the following factors:
 (1) whether the moving party established a reasonable likelihood of success on the merits; (2) whether the moving party will suffer irreparable harm without the requested injunctive relief; (3) whether the balance of the equities, including the public interest, weighed in favor of the moving party; and (4) whether the issuance of a preliminary injunction served to preserve the status quo ante. Allaire v. Fease, 824 A.2d 454, 457 (R.I. 2003.) *Page 7 
The purpose of a preliminary injunction is to preserve the status quo — that is, the last peaceable status prior to the controversy — to protect rights that otherwise might be irreparably endangered. DiDonato v. Kennedy,822 A.2d 179, 181 (R.I. 2003); E.M.B. Assoc. v. Sugarman,118 R.I. 105, 108; 372 A.2d 508, 509 (1977). Establishing a "reasonable likelihood of success on the merits" does not require establishing a certainty of success. DiDonato,822 A.2d at 181 (quoting Fund for Cmty. Progress v. UnitedWay, 695 A.2d 517, 521 (R.I. 1997)). Rather, establishing a prima facie case — evidence that would satisfy the burden of proof if unrebutted — is sufficient. Id.; Paramount Office SupplyCo. v. D.A. MacIsaac, Inc., 524 A.2d 1099, 1101 (R.I. 1987).
The "irreparable harm" standard requires that the moving party show that an injury for which there is no adequate remedy at law is either presently threatened or imminent. Fund for Cmty.Progress, 695 A.2d at 521. The immediacy of the threat must be considered in the context of the nature of the dispute between the parties. Id. at 523. In general, "[i]njuries which are prospective in nature, or which might not occur, cannot form the basis for injunctive relief." In re State Employees' Unions,587 A.2d 919, 925 (R.I. 1991); but see Iggy'sDoughboys, Inc. v. Giroux, 729 A.2d 701, 705 (R.I. 1999) (in which "prospective damage to a business's good will and reputation [was] precisely the type of irreparable injury for which an injunction [was] appropriate.") (Internal quotations omitted.) An irreparable harm is an "injury so irreparable that a decision of the arbitrator in the union's favor would be but an empty victory."In re State Employees' Unions,587 A.2d at 926 (internal quotations omitted).
I. The Union's Likelihood of Success on the Merits
This case concerns the tension between statutory obligations to negotiate and arbitrate and the needs of a municipality to exercise managerial control over its emergency services. The *Page 8 
Union quite correctly argues that the Firefighters' Arbitration Act ("FAA") bestows the right to bargain about the terms and conditions of employment and to submit certain "unresolved issues" to interest arbitration after bargaining impasse has been reached. Sections 28-9.1-2(a),-3(3),-4,-7,-10.
The Town argues quite correctly that there are certain managerial decisions "which lie at the core of entrepreneurial control" that the Town is free to make on its own without delegating authority to a labor union or an arbitrator. SeeProvidence Hospital v. NLRB,93 F.3d 1012, 1018 (1st Cir. 1996.) In a field as perilous as fire suppression, almost any management decision could have the potential to affect the safety or wellbeing of firefighters. SeeExeter-West Greenwich Regional School District v.Exeter-West Greenwich School District. Teachers' Association, P.M. No. 2008-4295, slip op. at 11 (R.I. Super. Nov. 13, 2008) (explaining that "[i]t is difficult, if not impossible to conceive of any decision made by a school committee related to its educational program that would not have some impact on the teachers who staff the district"); see also Pontiac FireFighters v. City of Pontiac, 753 N.W.2d 595, 601 (Mich. 2008) (explaining that "because firefighting is a dangerous job, every managerial decision in the abstract might touch on a safety issue.") Our state Supreme Court addressed the tension between mandatory labor negotiation and arbitration and managerial prerogatives inNorth Providence School Committee v. North Providence Federationof Teachers, 945 A.2d 339 (R.I. 2008.) In North ProvidenceSchool Committee, the school committee sought to vacate an arbitrator's decision in favor of the teachers' union on the grounds that the decision to eliminate a preparation period from certain teachers' schedules was a decision within the purview of managerial control. 945 A.2d at 341-42. Although the Supreme Court upheld the Superior Court's confirmation of the arbitrator's decision, it noted: *Page 9 
 We have acknowledged that [Title 16, from which school committees derive their authority] must be reconciled with other statutory provisions that authorize resort to arbitration in some circumstances . . .
 It is true that the sweeping language of Title 16 must be read in harmony with the provisions of [the Certified School Teachers' Arbitration Act, G.L. 1956 28-9.3-1 et seq.]; it is nonetheless a basic rule of law that school committees are not at liberty to bargain away their powers and responsibilities with respect to the essence of the educational mission. Id. at 346-47.[2]
Thus, while a statute may direct negotiation or even arbitration over the terms and conditions of employment, this directive must give way, under some circumstances, to the managerial prerogative to control the enterprise. See North ProvidenceSchool Committee, 945 A.2d at 347 (explaining that if the school committee had had a reason more consonant with its educational mission for eliminating teacher preparation time, the Court might have vacated the arbitrator's decision notwithstanding the effects of the school committee's actions on the terms and conditions of employment); see also First NationalMaintenance Corp. v. NLRB, [3] 452 U.S. 666, 676 (1981) (holding that in the context of mandatory bargaining about terms and conditions of employment under the National Labor Relations Act, 29 U.S.C. section 151 et seq. ("the NLRA"), "Congress had no expectation that the . . . union . . . would become an equal partner in the running of the business enterprise in which the union's members are employed. . . .[T]here is an undeniable limit to the subjects about which bargaining must take place.") *Page 10 
The inquiry then turns to whether, in light of the need for cities and towns to make some essential management decisions independent of the control of parties such as labor unions and arbitrators, the Town's decision to close Station 3 falls within the class of managerial prerogatives that need not be submitted to negotiation or arbitration. In making this determination, federal court cases interpreting the NLRA are instructive. Town of Narragansettv. International Ass'n of Fire Fighters, 119 R.I. 506, 507-08;380 A.2d 521, 522 (1977.) Addressing the scope of managerial rights, Judge Selya wrote:
 To be sure, certain management actions that ultimately may have a significant impact on the terms and conditions of employment within the bargaining unit are nonetheless beyond the purview of collective bargaining. In a much-quoted turn of phrase, Justice Stewart referred to these actions as comprising "the core of entrepreneurial control." Fibreboard Paper Prods. Corp. v. NLRB, 379 U.S. 203, 223, 85 S.Ct. 398, 409, 13 L.Ed.2d 233 (1964) (Stewart, J., concurring). The thesis holds that important management decisions, such as choosing a marketing strategy or liquidating lines of business, are not concinnous subjects for mandatory collective bargaining because they "are fundamental to the basic direction of [the] corporate enterprise." Id. . . . And while such matters are not primarily addressed to conditions of employment, they may have effects-sometimes profound effects-upon those conditions.
 . . . [T]he content of this core of entrepreneurial control eludes a precise description[. S]ee United Food Commercial Workers, Etc. v. NLRB, 1 F.3d 24, 30-33 (D.C. Cir. 1993)[.] Providence Hospital, 93 F.3d at 1018.
The municipality's motives or reasoning in making a decision is relevant to whether the decision is a managerial prerogative at the core of entrepreneurial control. In North ProvidenceSchool Committee, the court confirmed an arbitrator's finding that a change affecting staffing was arbitrable (i.e., not a managerial prerogative at the core of entrepreneurial control) on the grounds that the school committee was motivated purely by a desire to control payroll costs, not by any concerns germane to the educational mission. 945 A.2d at 347; see alsoFibreboard Paper *Page 11 Products Corp. v. NLRB, 379 U.S. 203, 213-14 (1964) (noting that personnel costs were "matters peculiarly suitable for resolution within the collective bargaining framework[.]")
The FAA empowers the firefighters to "bargain collectively . . . and be represented by a labor organization . . . as to wages, rates of pay, hours, working conditions, and all other terms and conditions of employment." Section 28-9.1.-4. The town is obligated to "meet and confer" with the union with the goal of crafting a new contract. Section 28-9.1-6. However, the broad terms of § 28-9.1-4 are not incorporated into the subsequent sections of the FAA, which mandate binding interest arbitration. Sections 28-9.1-4,-7,-10. While the parties must negotiate on the broad range of subjects, once an impasse is reached, and mandatory arbitration results, the arbitrators "render their decision upon the basis of a prompt, peaceful, and just settlement of wage and hour disputes . . ." Id.
(emphasis added.) The plain language of the Act limits the decision to wage and hour disputes. Section 28-9.1-10. "In arriving at the decision[,]" the arbitrators consider the factors of "welfare of the public[,]" "hazards of employment[,]" and even the "community's ability to pay[.]" Sections 28-9.1-10(4)-(6). Yet these are onlyfactors to be considered in deciding the issues of wage and hour disputes. Section 28-9.1-10.
The statute is clear. The Town and the Union should negotiate on working conditions. Failing to reach an accord, however, the parties are not compelled to submit unresolved issues regarding matters other than wages and hours to interest arbitration, particularly where such decisions would interfere with management prerogatives. The arbitrators may consider certain factors related to the terms and conditions of employment in resolving wage and hour disputes, but only wage and hour disputes are mandatory subjects of interest arbitration under the FAA. In the end, it is management who must make the critical, operational decisions characteristic of any organization with a quasi-military hierarchy. *Page 12 
While a union can press for such terms as part of a global settlement of all issues, the union's ability to require a certain number of engines, fire stations or personnel in the town is limited, particularly where the changes do not effect worker (firefighter) safety, wages or hours. Here, the Town faces a serious fiscal problem, compounded by a decline of State funding. Its elected officials are seeking to eliminate expenses and are charged by the Town Charter to operate the Town government.
The Union relies on Town of Narragansett for the proposition that decisions that affect firefighter safety are mandatory subjects of bargaining. 119 R.I. at 508, 380 A.2d at 522. The Union misconceives the holding of Town of Narragansett, which does not hold that parties are compelled to submit unresolved issues regarding terms and conditions of employment to interest arbitration. See id. Even assuming arguendo that Town of Narragansett's holding was as the Union describes it, it still would not help the Union. Because firefighting is such a dangerous enterprise that virtually all management decisions potentially could affect the safety and wellbeing of firefighters, extending the Union's conception of the holding of Town ofNarragansett to all management decisions that so much as touch upon safety concerns would effectively cede managerial control to the State's firefighters' unions. Such a relinquishment of control is not conducive to the responsible management of emergency services. See Providence Hospital,93 F.3d at 1018 ("[t]hus [the Union] had no right . . . to veto the decision to merge. . . ."); Barrington School Committee v.RISLRB, 120 R.I. 470, 479; 388 A.2d 1369, 1375 (1978) ("We do not mean that the union should be able to dictate to the committee on matters strictly within the province of management.")
In addition, this case is distinguishable from Town ofNarragansett on the strength and persuasiveness of the evidence of threats to firefighter safety. The effects of staffing levels on *Page 13 
safety were demonstrated by ample evidence in Town ofNarragansett. 119 R.I. at 508, n. 1; 380 A.2d at 522, n. 1. In contrast, the Union never established a threat to firefighter safety or to public safety. Rather, the evidence established that the Town has one of the fastest response times in the area, and will continue to have a prompt response time, consistent with national standards. Here, the issue is not even a decrease in the number of employees, but just a decrease in the number of fire stations. The Union has not established any effect upon firefighter safety.[4]
Under the standards described above, the Union has not demonstrated a reasonable likelihood of success on the merits of its case; therefore, the Court must deny the Union's Motion for a Preliminary Injunction. The decision to close a fire station to make more profitable use of the station facility and thereby achieve economic savings is fundamental to the basic direction of the enterprise. Disposing of or repurposing the Fire Department's property is an executive-level decision at the "core of entrepreneurial control." It is a managerial decision about how to deploy the Fire Department's resources in the most efficient manner that has minor, incidental effects on the terms and conditions of firefighter employment. The Town's decision was based on considerations relating to the essence of the firefighting mission, not on a desire to eliminate firefighter jobs. No firefighters will lose their jobs as a result of Station 3's closing. The Town's motives, related to the overall direction of the enterprise, further militate against submitting the unresolved issues in question to arbitration. See North Providence School Committee,945 A.2d at 347.
The Union relies on Katz v. NLRB, 369 U.S. 736 (1962) to support its position that the Town could not unilaterally close Station 3 while negotiations were ongoing. (Pl.'s Mem. 4.) *Page 14 
This reliance is misplaced. Katz stands for the proposition that employers may not take unilateral action on subjects of mandatory bargaining under the National Labor Relations Act while negotiations are underway. 369 U.S. at 737, 743. The Katz
employer granted merit pay increases, changed the sick-leave policy, and changed the policy regarding other increases in wages while it negotiated the same issues with the union. Id. at 741. These topics were mandatory because the NLRA directed bargaining on those topics and the topics did not implicate managerial rights.Id. at n. 2. As explained above, decisions that are purely managerial are not mandatory subjects of negotiation or arbitration.See Providence Hospital, 93 F.3d at 1018;North Providence Sch. Comm., 945 A.2d at 346-47. Because the Town's decision to close Station 3 was a matter of management rights, the holding of Katz does not apply to the facts in the instant case.
II. Irreparable Harm
Despite the fact that the requested injunction cannot issue because the movant does not have a reasonable likelihood of success on the merits, the Court will consider briefly whether the Union will suffer irreparable harm without the requested relief.
The Union's alleged harm has two components: the permanence of the closure of the station facility, and the physical harm that the firefighters might suffer if their jobs become more dangerous as a result of the station's closing.[5] The Town's plans for the facility are not yet set in stone: the Town first desires to minimize its current expenses by eliminating one of its four active fire stations. If a tenant moves into the building, it may be arduous to remove the tenant.[6] *Page 15 
Hence, the Union's allegation that it would be extremely difficult to reopen a fourth station appears speculative at this point.
However, the issue is whether the Union and its members will suffer irreparable harm absent an injunction. In the unlikely event that the Union succeeds on the merits of its case and the unresolved issues about engine company minimums go to interest arbitration or further litigation, the Union may receive some sort of relief. The Union suggests that an arbitrator would not order Station 3 reopened (see Pl.'s Mem. 5-6); however, an arbitrator or court could order some sort of make-whole relief or other concession if it finds that the firefighters suffered financial loss. Thus, any threatened harm is not irreparable because an adequate remedy at law exists, whether or not the station reopens. See In re StateEmployees' Unions, 587 A.2d at 926.
Before leaving this issue, specific mention must be given to the safety of the firefighters who risk their lives for the public every day. Having considered this important issue throughout the hearing and in continuing to review the evidence and analysis provided by counsel, the Court does not find an imminent threat — or any increased threat — to the physical safety of the firefighters. Obviously, the work of firefighting and rescue is, perilous by its nature. The Court recognizes the bravery and dedication required of persons involved in these emergency response fields. Yet, the Court cannot and will not speculate that the closing may somehow affect firefighter safety or create an increased risk. The Union provided incomplete evidence amounting to little more than assertions of effects upon increased call volume and changes in response times. The threatened harm is speculative, not imminent; therefore, a preliminary injunction cannot issue. *Page 16 
 III. Balancing the Equities
The task of balancing the equities includes weighing the public's interest in the matter. Allaire, 824 A.2d at 457. In this case, the Union failed to establish that the closure of the station or the elimination of an engine company would have an effect on public safety. The Court has previously discussed the evidence submitted at trial and cannot conclude that the public safety is at risk. Rather, the elimination of the station would remain at recommended national and state levels. The Union submitted evidence discussing various incidents where the location of the station was an asset in responding to certain events. The record is replete with descriptions of the firefighters placing themselves in harm's way by responding promptly and heroically in life-saving maneuvers. Yet the substantial size of the North Providence force, the number of remaining stations for a community of that size, and the limited hazards in the Town, together with the continued dedication of the firefighters — all of whom will remain on staff — convince the Court that the public safety remains protected.
In evaluating the equities of the case, the Court notes that no firefighters will lose their jobs as a result of the station closing. While the manner in which the Town executed its decision to close the station left much to be desired, the Town was within its rights to make such a decision.[7] The Union claims that the station's sudden closure has created confusion and problems relating to members' bidding rights (Pl.'s Mem. 3); these problems might have been lessened had the Town provided more advance notice of its decision to close the station to the Union. While not obligated under the FAA to negotiate (or subsequently arbitrate) this managerial decision with the Union, the Town may have ameliorated the situation by taking a *Page 17 
less-rushed, more deliberative approach to closing the station. Taking these factors into account, the Court determines that the weight of the equities are evenly balanced.
IV. Maintaining the Status Quo
The issue of the status quo is one of the four elements to be considered by the Court in weighing whether to grant a preliminary injunction. However, the Court also indicated its concern regarding the status quo because it granted a temporary injunction ordering the fire station to remain open. Prior to issuance of the injunction, the Court was led to believe the station was not yet closed. (See Verified Complaint paragraphs 4, 5 and 6.)
During the preliminary injunction hearing (and in media reports following the issuance of the restraining order), it became clear to the Court that Station 3 had already been closed by the Townprior to the initiation of this litigation. The status quo, the last peaceful situation prior to litigation, was a closed fire station.[8] (See Exhibit 15.)
 CONCLUSION
The Union has failed to establish a reasonable likelihood of success on the merits, irreparable harm, equities weighing in its favor, or that an injunction would preserve the status quo. The Plaintiff's motion for issuance of a preliminary injunction is denied and the temporary restraining order previously issued in this action is quashed.
[1] The standards appear to have separate goals. These goals include having initial responders on the scene promptly to perform immediate life sustaining services and setup, while the full deployment within eight minutes serves to limit a catastrophic result, such as a "flashover."
[2] The North Providence School Committee Court went on to note it would not vacate an arbitrator's decision that the issue of eliminating a teacher preparation period was arbitrable because the school committee had based its decision exclusively on payroll costs, not on considerations related to the educational mission of the organization. 945 A.2d at 347.
[3] First National Maintenance, a case about the closure of one of several plants, mandates a balancing test — the benefit of bargaining to the labor-management relationship weighed against the burden on management — to determine if the decision to close a branch of a business is a mandatory subject of bargaining under the NLRA where the closure would "have a substantial impact on the continued availability of employment." 452 U.S. at 679. The Court does not apply such a test in this case because there is no threat of job loss under the Town's plan to close Station 3.
[4] In fact, the safety issues raised at the hearing concerned safety only. As indicated, the Court found the Town's evidence far more persuasive — that the response time would continue to satisfy the national and state standards. While the Union questioned the new response time, it offered scant proof and failed to establish that firefighter safety was at any greater risk.
[5] It is interesting to note that the Union's original memorandum and complaint (Complaint, paragraph 4) allege a threat to public safety. At the hearing, it was clear that the Union was attempting to establish a threat to firefighter safety.
[6] A deed offered into evidence suggests that the Town cannot use the Station 3 facility except for firefighting purposes, hence the Town may still occupy the facility throughout the litigation and arbitration.
[7] At first blush, the Court was concerned by the manner in which the Town executed its decision to close the station. It did not immediately share its consultant's report; furthermore, the station was closed within hours of Mayor Lombardi's decision. Still, the closure was not a surprise. Labor negotiations, like most litigation, often involve tactical decisions in the heat of the moment.
[8] This issue is particularly important to the Court as it is significant in considering whether to leave the issue for the arbitrator to decide. As this Court decided just this month, arbitrators have the authority to determine issues of arbitrability. (East Providence v. RI State Association of Firefighters,Local 850 I.A.F.F. et al, P.C. No. 2009-4974, December 2, 2009 case). This Court is reluctant to involve itself in issues which will be subject to arbitration but here, the Court unknowingly changed the status quo by the issuance of the temporary restraining order. Like it or not, the Court was reluctantly involved in a portion of the process.